[L. A. No. 8012. In Bank.—February 27, 1925.]

GEORGE LEE MILLER et al., Appellants, v. BOARD OF PUBLIC WORKS OF THE CITY OF LOS ANGELES et al., Respondents.

[1] POLICE POWER—RIGHT OF EXERCISE BY STATE.—The police power of a state is an indispensable prerogative of sovereignty and one that is not to be lightly limited; and even though at times its operation may seem harsh, the imperative necessity for its existence precludes any limitation upon its exercise save that it be not unreasonably and arbitrarily invoked and applied.

[2] ID.—LIMITING OF POLICE POWER—PUBLIC CONSIDERATIONS.—The police power of the state is not illimitable and the marking and measuring of the extent of its exercise and application is determined by a consideration of the question of whether or not any invocation of that power, in any given case, and as applied to existing conditions, is reasonably necessary to promote the public health, safety, morals, or general welfare of the people of a community.

[3] ID.—CHANGING CONDITIONS—INTERPRETATION OF POLICE POWER.— The police power, as such, is not confined within the circumscription of precedents, resting upon past conditions which do not cover and control present-day conditions obviously calling for revised regulations to promote the health, safety, morals or general welfare of the public, and as a commonwealth develops politically, economically, and socially, the police power likewise develops, within reason, to meet the changed and changing conditions, and what was at one time regarded as an improper exercise of the police power may now, because of changed living conditions, be recognized as a legitimate exercise of that power.

[4] ID.—DEVELOPMENT OF POLICE POWER.—In its inception the police power was closely concerned with the public peace, safety, morals, and health, without specific regard for the general welfare, but the increasing complexity of our civilization and institutions later gave rise to cases wherein the promotion of the public welfare was held by the courts to be a legitimate object for the exercise of the police power, and as our civic life has developed, so has the definition of "public welfare," until it has been held to em-

1. Police power and the fourteenth amendment, note, 25 Am. St. Rep. 882, 888. See, also, 6 R. C. L. 183.
2. See 6 R. C. L. 188.
3. See 6 R. C. L. 189.
4. See 6 R. C. L. 203.

brace regulations to promote the economic welfare, public convenience, and general prosperity of the community.

[5] ID.—ELASTICITY OF POLICE POWER.—The police power is not a circumscribed prerogative, but is elastic and, in keeping with the growth of knowledge and the belief in the public mind of the need for its application, capable of expansion to meet existing conditions of modern life and thereby keep pace with the social, economic, moral, and intellectual evolution of the human race.

[6] MUNICIPAL CORPORATIONS — ZONING ORDINANCES — GENERAL WELFARE.—The rapidity of the growth of the sentiment in favor of comprehensive zoning, coupled with the extensive and successful application of the idea, are evidence of its present and potential value for the promotion and perpetuation, along broader and better lines, of the moral and material welfare of the people.

[7] ID.—CONSTITUTIONAL LAW.—The constitutional right of municipalities to zone certain districts and the sanctioning of the principle upon which the right is founded have been settled.

[8] ID.—ZONING — NATURE OF.—In its original and primary sense zoning is simply the division of a city into districts and the prescription and application of different regulations in each district, which regulations are divided into two classes: (1) Those which regulate the height or bulk of buildings within certain designated districts,—in other words, those regulations which have to do with the structural and architectural designs of the buildings,—and (2) those which prescribe the use to which buildings within certain designated districts may be put.

[9] ID.—VALIDITY OF ZONING IN CALIFORNIA.—In California it is well settled that there is no objection to zoning ordinances as such.

[10] ID.—POWER TO ZONE—LIMIT.—In California the power of prohibition and segregation of certain businesses by means of zoning is not limited to nuisances *per se,* but may be used not only negatively but constructively and affirmatively for the promotion of the public welfare.

[11] ID.—CONSTITUTIONAL LAW.—It is thoroughly established in this country that the rights preserved to the individual by the constitutional guaranties are held in subordination to the rights of society and to the general welfare.

---

7.  Validity of ordinance regulating location or construction of retail stores, note, **Ann. Cas.** 1915A, 294.

Validity of ordinance prohibiting carrying on business in residential district, note, **Ann. Cas.** 1914A, 132. See, also, 18 **Cal. Jur.** 858.

9.  See 18 **Cal. Jur.** 859.

10. See 18 **Cal. Jur.** 860.

[12] ID.—VALIDITY OF ZONING ORDINANCES — DETERMINATION OF — RULE.—Courts are required in considering the validity of zoning ordinances to determine, in addition to the need thereof, whether or not they are arbitrary and discriminatory in their conception and application and whether they have any reasonable tendency to promote the public morals, health, safety, or general welfare and prosperity of the community.

[13] ID.—DEVELOPMENT OF CITIES—PROMOTION OF GENERAL WELFARE —POLICE POWER.—The regulation of the development of a city, under a comprehensive and carefully considered zoning plan, tends to promote the general welfare of the community, and the adoption and enforcement of such a plan, when fairly conceived and equably applied, is well within the scope of the police power and is constitutional.

[14] ID.—VALIDITY OF ZONING ORDINANCE — DUTY OF COURT.—The duty devolves upon the courts to determine in each instance whether or not a zoning ordinance, either in whole or in part, is invalid, and in such determination two questions present themselves: (1) Is the scheme of zoning as a whole sound, that is to say, is the method of classification and districting reasonably necessary to the public health, safety, morals, or general welfare? and (2) Has the scheme of classification and districting been applied fairly and impartially in each case.

[15] ID.—ESTABLISHING RESIDENTIAL DISTRICTS—POWER.—A municipality under the police power delegated to it may legally establish, as a part of a comprehensive zoning plan, strictly private residential districts from which are excluded and absolutely prohibited general business enterprises, apartments, tenements, and like structures.

[16] ID.—LEGISLATIVE DISCRETION — REVIEW.—A large discretion is vested in the legislative branch of the government with reference to the exercise of the police power, and courts are loath to substitute their judgment as to the necessity for a particular enactment in place of the legislative judgment.

[17] ID.—PRESUMPTION IN FAVOR OF LEGISLATION.—The courts may differ with the legislature as to the wisdom and propriety of a particular enactment as a means to accomplishing a particular end, but as long as there are considerations of public health, safety, morals, or general welfare which the legislative body may

15.  Creation by statute or ordinance of restricted residence districts within municipality from which business buildings are excluded, notes, 19 A. L. R. 1395; 33 A. L. R. 287. See, also, 18 Cal. Jur. 866.

16.  See 18 Cal. Jur. 862.

have had in mind, which could have justified the regulation, it must be assumed by the court that the legislative body had those considerations in mind and that those considerations justified the regulation.

[18] ID.—JUSTIFICATION FOR RESIDENTIAL ZONING.—Justification for residential zoning may, in the last analysis, be rested upon the protection of the civic and social values of the American home, as the establishment of such districts is for the general welfare, because it tends to promote and to perpetuate the American home.

[19] ID.—PURPOSE OF ZONING.—The purpose of comprehensive zoning is the attainment of unity in the construction and development of a city, along lines of reasonable regulations which tend to promote the health, safety, morals, and general welfare of the community, and to accomplish this purpose there must be definitely in the minds of the makers of comprehensive zoning, a plan, in outline at least, sufficiently extensive so that when embodied in an enacted ordinance a reviewer thereof may say with confidence that it will redound to the welfare of the city as a whole and that any part of that plan is reasonably related thereto.

[20] ID.—COMPREHENSIVE ZONING — EXTENSIONS. — A comprehensive zoning plan should contemplate and provide for the planning from time to time of the execution of further details, extensions, and such modifications of existing features as unforeseen changes, occurring in the civic conditions, make necessary to the protection and perpetuation of the plan.

[21] ID.—PERFECTION OF ZONING PLAN — TIME—JUDICIAL NOTICE.— It is a matter of common knowledge that a zoning plan for a whole city cannot be made in a day, and therefore the courts will take judicial notice of the fact that it will take much time to work out the details of such a plan and that it would be destructive of the plan if, during the period of its incubation, parties seeking to evade the operation thereof should be permitted to enter upon a course of construction which might progress so far as to defeat in whole or in part the ultimate execution of the plan.

[22] ID.—EMERGENCY ORDINANCE — VALIDITY OF.—The fact that a comprehensive zoning plan for a city had not matured to the point of being an enacted and existing ordinance at the time an emergency ordinance was passed covering a certain district of the city does not detract from the validity of the latter ordinance upon the theory that there could be no assurance that the contemplated zoning ordinance would be ultimately enacted and enforced.

[23] ID.—INITIAL UNIT IN ZONING—EMERGENCY ORDINANCE—VALID-
ITY OF.—An emergency zoning ordinance covering a certain dis-
trict of a city which is an initial unit in a general zoning plan
for the city is part and parcel of a comprehensive plan which has
relation to the welfare of the city as a whole, and is a valid
exercise of the police power.

(1) 12 C. J., p. 907, n. 10, p. 908, n. 22, p. 932, n. 33.   (2) 12
C. J., p. 929, n. 21.   (3) 12 C. J., p. 909, n. 31.   (4) 12 C. J., p. 904,
n. 89, p. 920, n. 56.   (5) 12 C. J., p. 908, n. 25.   (6) 12 C. J.,
p. 920, n. 56.   (7) 12 C. J., p. 1265, n. 61.   (8) 12 C. J., p. 1266,
n. 67; 28 Cyc., p. 736, n. 47.   (9) 28 Cyc., p. 736, n. 47.   (10) 12
C. J., p. 922, n. 68; 28 Cyc., p. 736, n. 47.   (11) 12 C. J., p. 905,
n. 91, p. 931, n. 31.   (12) 12 C. J., p. 930, n. 22.   (13) 28 Cyc.,
p. 736, n. 47.   (14) 12 C. J., p. 908, n. 23.   (15) 28 Cyc., p. 736,
n. 47.   (16) 12 C. J., p. 933, n. 39, p. 934, n. 43, 48.   (17) 12
C. J., p. 799, n. 66.   (18) 28 Cyc., p. 736, n. 47.   (19) 28 Cyc.,
p. 736, n. 47.   (20) 28 Cyc., p. 736, n. 47.   (21) 23 C. J., p. 165,
n. 56.   (22) 12 C. J., p. 799, n. 63.   (23) 28 Cyc., p. 736, n. 47.

APPEAL from a judgment of the Superior Court of Los
Angeles County.   Victor R. McLucas, Judge.   Affirmed.

The facts are stated in the opinion of the court.

Wm. W. Bearman and W. L. Engelhardt for Appellants.

Jess E. Stephens, City Attorney, and Lucius P. Green,
Assistant City Attorney, for Respondents.

George Lull, City Attorney, and Maurice T. Dooling, As-
sistant City Attorney, on behalf of the City of San Fran-
cisco, *Amicus Curiae.*

Lewis J. Utt, for City Planning Commission of the City
of San Diego et al., *Amici Curiae.*

Hill & Morgan, Milton M. Cohen and Jerome H. Kahn,
*Amici Curiae.*

LENNON, J.—This proceeding in *mandamus* was insti-
tuted in the superior court of the county of Los Angeles
to compel the respondents, the Board of Public Works of
the City of Los Angeles, to issue to plaintiffs a permit to

23.   See 18 Cal. Jur. 865.

erect a four-family flat dwelling on a tract of land located on West Adams Street in said city. At the time the plaintiffs first made application to the board for a building permit an existing zoning ordinance of said city did not prohibit the erection of four-family flat dwellings in residence district No. 20, wherein plaintiffs' lot was located. A permit for the erection of such building was therefore issued. Shortly thereafter, the permit was canceled and revoked by said board for the reason that the city council of Los Angeles was contemplating a comprehensive zoning plan, covering the entire city and that as a part of that comprehensive zoning scheme, and in keeping therewith, an ordinance would be enacted prohibiting the erection or construction of four-family flats in that part of the city wherein the plaintiffs' property was located. On September 1, 1921, this action was instituted by the filing of a complaint to compel the issuance of a permit. On September 6, the city council of Los Angeles passed an emergency ordinance, No. 42510 (N. S.), which declared it to be unlawful "for any person, firm or corporation to erect, or construct, alter or maintain, or cause or permit to be erected, constructed, altered or maintained within the residence zone hereby created, any building or premises which shall be used for, or designed or intended to be used for housing more than two families together with its usual accessories."

The only defense interposed by the board to the issuance of the writ was the existence of the last-mentioned ordinance. The trial court held said ordinance to be a valid exercise of the police power of the municipality and denied the writ of mandate sought by the plaintiffs. From this judgment plaintiffs appeal.

No point is made that the board has not the power to revoke a permit once it has been duly issued nor that the ordinance, if valid, may not operate retroactively to nullify a permit previously issued.

At the threshold of the discussion it may be well to state that in other jurisdictions the question has been presented of whether or not the power to pass a particular zoning ordinance has been delegated to a municipality, but that question is not raised here, obviously for the reason that the power to do so is conferred upon municipalities in California by the fundamental law of the state and by a legis-

lative enabling act, entitled: "An act to provide for the establishment within municipalities of districts or zones within which the use of property, height of improvements and required open spaces for light and ventilation of such buildings, may be regulated by ordinance." (Stats. 1917, p. 1419.)

The constitutional grant of power to the municipalities is to be found in section 11 of article XI of the constitution, which provides that:

"Any county, city, town, or township may make and enforce within its limits all such local, police, sanitary and other regulations as are not in conflict with general laws."

The Enabling Act of 1917 declares that:

"For the public interest, health, comfort, convenience, preservation of the public peace, safety, morals, order and the public welfare, the city council, board of trustees or other legislative body of any incorporated city and town of California, hereinafter referred to as the council, may by ordinance create or divide the city into districts within some of which it shall be unlawful to erect, construct, alter or maintain certain buildings, or to carry on certain trades or callings or within which the height and bulk of future buildings shall be limited. The council may by ordinance regulate, restrict and segregate the location of industries, the several classes of business, trades or callings, the location of apartment or tenement houses, club-houses, group residences, two-family dwellings, single family dwellings and several classes of public and semi-public buildings, and the location of buildings or property designed for specified uses, and may divide the city into districts of such number, shape and area as the council may deem best suited to carry out the purposes of this act. . . . For each such district regulations may be imposed designating the class of use that shall be excluded or subjected to special regulations and designating the uses for which buildings may not be erected or altered, or designating the class of use which only shall be permitted. . . . " (Stats. 1917, p. 1419.)

It may also be noted, at the outset, that the ordinance in question is prohibitory in its nature and that the prescribed prohibition is absolute. The ordinance does not attempt to designate and regulate the materials to be used in the buildings nor does it purport to regulate the height, area, and architectural design of such buildings as may be erected

within the designated district. It prohibits the construction of *any* building, irrespective of height, area, bulk, structural design, or architectural features, "designed or intended to be used for the housing of more than two families." It is, in short, purely prohibitory zoning directed solely to use and occupation.

The sole question presented is whether or not the ordinance in controversy is a rightful exercise of the police power conferred upon municipalities.

[1] The police power of a state is an indispensable prerogative of sovereignty and one that is not to be lightly limited. Indeed, even though at times its operation may seem harsh, the imperative necessity for its existence precludes any limitation upon its exercise save that it be not unreasonably and arbitrarily invoked and applied. (*Hadacheck* v. *Sebastian,* 239 U. S. 394 [Ann. Cas. 1917B, 927, 60 L. Ed. 348, 36 Sup. Ct. Rep. 143]; *District of Columbia* v. *Brooke,* 214 U. S. 138, 149 [53 L. Ed. 941, 29 Sup. Ct. Rep. 560, see, also, Rose's U. S. Notes].) [2] It is not, however, illimitable and the marking and measuring of the extent of its exercise and application is determined by a consideration of the question of whether or not any invocation of that power, in any given case, and as applied to existing conditions, is reasonably necessary to promote the public health, safety, morals (*Hannibal etc. R. R. Co.* v. *Husen,* 95 U. S. 465, 470, 471 [24 L. Ed. 527]; *Boston Beer Co.* v. *Massachusetts,* 97 U. S. 25 [24 L. Ed. 989]), or general welfare of the people of a community. (*Chicago, B. & Q. Ry. Co.* v. *Illinois,* 200 U. S. 561, 592 [4 Ann. Cas. 1175, 50 L. Ed. 596, 26 Sup. Ct. Rep. 341, see, also, Rose's U. S. Notes].)

[3] In short, the police power, as such, is not confined within the narrow circumspection of precedents, resting upon past conditions which do not cover and control present-day conditions obviously calling for revised regulations to promote the health, safety, morals, or general welfare of the public. That is to say, as a commonwealth develops politically, economically, and socially, the police power likewise develops, within reason, to meet the changed and changing conditions. What was at one time regarded as an improper exercise of the police power may now, because of changed living conditions, be recognized as a legitimate exercise of that power. This is so because: "What was a reasonable

exercise of this power, in the days of our fathers may to-day seem so utterly unreasonable as to make it difficult for us to comprehend the existence of conditions that would justify same; what would by our fathers have been rejected as unthinkable is to-day accepted as a most proper and reasonable exercise thereof.'' (*Streich* v. *Board of Education*, 34 S. D. 169 [Ann. Cas. 1917A, 760, L. R. A. 1915A, 632, 147 N. W. 779].)

[4] In its inception the police power was closely concerned with the preservation of the public peace, safety, morals, and health without specific regard for ''the general welfare.'' The increasing complexity of our civilization and institutions later gave rise to cases wherein the promotion of the public welfare was held by the courts to be a legitimate object for the exercise of the police power. As our civic life has developed so has the definition of ''public welfare'' until it has been held to embrace regulations ''to promote the economic welfare, public convenience and general prosperity of the community.'' (*Chicago, B. & Q. R. Co.* v. *Illinois, supra.*) [5] Thus it is apparent that the police power is not a circumscribed prerogative, but is elastic and, in keeping with the growth of knowledge and the belief in the popular mind of the need for its application, capable of expansion to meet existing conditions of modern life and thereby keep pace with the social, economic, moral, and intellectual evolution of the human race. In brief, ''there is nothing known to the law that keeps more in step with human progress than does the exercise of this power.'' (*Streich* v. *Board of Education, supra*), and that power ''may be put forth in aid of what is sanctioned by usage, or held by the prevailing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare.'' (*Noble State Bank* v. *Haskell,* 219 U. S. 104 [Ann. Cas. 1912A, 487, 32 L. R. A. (N. S.) 1062, 55 L. Ed. 112, 31 Sup. Ct. Rep. 186, see, also, Rose's U. S. Notes].)

There can be no question but that there is a prevailing and preponderating sentiment in favor of necessary and reasonable zoning. The growth of this sentiment has been rapid and widespread. The first comprehensive zoning ordinance was that of New York City enacted in 1916. According to a recent bulletin of the United States Department of Com-

merce, 35 states and the District of Columbia have adopted this form of regulation; 221 municipalities have been zoned and over 22,000,000 inhabitants, aggregating 40 per cent of the urban population of this country, are living in zoned territory. **[6]** The rapidity of the growth of the sentiment in favor of comprehensive zoning, coupled with the extensive and successful application of the idea, are evidence of its present and potential value for the promotion and perpetuation, along broader and better lines, of the moral and material welfare of a people.

**[7]** So thoroughly has the value of zoning been demonstrated that no longer is the constitutionality of the principle open to question. The books abound with cases upholding the constitutional right to zone and sanctioning the principle upon which that right is founded. **[8]** In its original and primary sense zoning is simply the division of a city into districts and the prescription and application of different regulations in each district. Roughly stated, these regulations, which may be called "zoning regulations," are divided into two classes: 1. Those which regulate the height or bulk of buildings within certain designated districts,—in other words, those regulations which have to do with structural and architectural designs of the buildings,— and (2) those which prescribe the use to which buildings within certain designated districts may be put. Both modes of regulation have received the sanction of the supreme court of the United States. In *Welch* v. *Swasey*, 214 U. S. 91 [53 L. Ed. 923, 29 Sup. Ct. Rep. 567], the constitutionality of the right to district a city and set up different regulations with respect to the height of buildings in each district was upheld. In *Barbier* v. *Connolly*, 113 U. S. 27 [28 L. Ed. 923, 5 Sup. Ct. Rep. 357], *Soon Hing* v. *Crowley*, 113 U. S. 703 [28 L. Ed. 1145, 5 Sup. Ct. Rep. 730], *Reinman* v. *Little Rock*, 237 U. S. 171 [59 L. Ed. 900, 35 Sup. Ct. Rep. 511], and *Hadacheck*, v. *Sebastian*, 239 U. S. 394 [Ann. Cas. 1917B, 927, 60 L. Ed. 348, 36 Sup. Ct. Rep. 143, see, also, Rose's U. S. Notes], it was held that by the exercise of the police power certain occupations could be restricted to certain defined portions of a city.

**[9]** In California it is well settled that there is no objection to zoning ordinances as such. There are many decisions in this jurisdiction upholding the right to zone for

use. Thus it has been held that laundries, livery-stables, lumber-yards, brickyards, and undertaking establishments may be restricted to certain districts. (*Ex parte Moynier*, 65 Cal. 33 [2 Pac. 728]; *In re Hang Kie*, 69 Cal. 149 [10 Pac. 327]; *Grumbach* v. *Lelande*, 154 Cal. 679 [98 Pac. 1059]; *Ex parte Quong Wo*, 161 Cal. 220 [118 Pac. 714]; *In re Montgomery*, 163 Cal. 457 [Ann. Cas. 1914A, 130, 125 Pac. 1070]; *Ex parte Hadacheck*,165 Cal. 416 [L. R. A. 1916B, 1248, 132 Pac. 584] (affirmed in *Hadacheck* v. *Sebastian, supra*); *Sam Kee* v. *Wilde*, 41 Cal. App. 528 [183 Pac. 164]; *Boyd* v. *City of Sierra Madre*, 41 Cal. App. 520 [183 Pac. 230]; *Brown* v. *City of Los Angeles*, 183 Cal. 783 [192 Pac. 716].)

It is conceded, as indeed it must be, by the opponents of the ordinance in controversy here that it is within the police power, by zoning, to banish nuisances and "near-nuisances" from certain districts. It is disputed, however, that the police power may be extended by any zoning ordinance, comprehensive or otherwise, to the regulation and isolation of vocations, business enterprises, and residential uses which are not intrinsically obnoxious. [10] A perusal of the decisions in California, which have upheld the prohibition and segregation of certain businesses by means of zoning, indicates that the court has not limited the power to zone to nuisances *per se,* and has held that certain business establishments, harmless in themselves, may become "near-nuisances" because of the character of the neighborhood in which they are operating. In *Ex parte Quong Wo, supra,* the court justified the exclusion of a certain type of laundry from a residential district upon the theory that a laundry is "of such a nature that it may be confined, in the lawful exercise of the police power within defined limits in a city." This is tantamount to saying that whenever the recognized purposes for which the police power may be called into play are subserved either by exclusion or segregation of any business, it may be thus regulated. This is but another way of saying that any zoning regulation is a valid exercise of the police power which is necessary to subserve the ends for which the police power exists, namely, the promotion of the public health, safety, morals, and general welfare. It will thus be seen that the police power as evidenced in zoning ordinances has a much wider scope than the mere suppres-

sion of the offensive uses of property (*Des Moines* v. *Manhattan Oil Co.*, 193 Iowa, 1096 [23 A. L. R. 1322, 184 N. W. 823, 188 N. W. 921]), and that it acts not only negatively but constructively and affirmatively for the promotion of the public welfare. (*Bacon* v. *Walker*, 204 U. S. 311 [51 L. Ed. 499, 27 Sup. Ct. Rep. 289, see, also Rose's U. S. Notes].)

Much is said about the constitutional guaranties attaching to the ownership of property in the individual. In this behalf it will be noted that:

[11] "It is thoroughly established in this country that the rights preserved to the individual by these constitutional provisions are held in subordination to the rights of society. Although one owns property, he may not do with it as he pleases any more than he may act in accordance with his personal desires. As the interest of society justifies restraints upon individual conduct, so, also, does it justify restraints upon the use to which property may be devoted. It was not intended by these constitutional provisions to so far protect the individual in the use of his property as to enable him to use it to the detriment of society. By thus protecting individual rights, society did not part with the power to protect itself or to promote its general well-being. Where the interest of the individual conflicts with the interest of society, such individual interest is subordinated to the general welfare. If in the prosecution of governmental functions it becomes necessary to take private property compensation must be made. But incidental damages to property resulting from governmental activities, or laws passed in the promotion of the public welfare are not considered a taking of the property for which compensation must be made." (*Carter* v. *Harper*, 182 Wis. 148 [196 N. W. 451]; *Chicago, B. & Q. R. Co.* v. *Illinois, supra.*)

[12] It may be taken as now well settled that courts are required in considering the validity of zoning ordinances to determine, in addition to the need thereof, whether or not they are arbitrary and discriminatory in their conception and application and whether they have any reasonable tendency to promote the public morals, health, safety, or general welfare and prosperity of a community. [13] It may be safely said, we think, that it is the concensus of opinion that the regulation of the development of a city, under a

comprehensive and carefully considered zoning plan, does tend to promote the general welfare of a community, and there is no doubt, it seems to us, that the adoption and enforcement of such a plan, when fairly conceived and equably applied, is well within the scope of the police power. The increase of our urban population makes regulation necessary. As the congestion of our cities increases, likewise do the problems of traffic control and police, fire, and health protection. Comprehensive and systematic zoning aids is the successful solution of these problems and obviously tends thereby to affirmatively promote the public welfare. Decisions upon the constitutionality of comprehensive zoning are not numerous but the weight of authority upon the subject is, however, strongly in favor of the constitutionality of comprehensive zoning. (*Lincoln Trust Co. v. William Building Corp.*, 229 N. Y. 313 [128 N. E. 209]; *Ware v. City of Wichita*, 113 Kan. 153 [214 Pac. 99]; *State ex rel. Carter v. Harper, supra; In re Opinion of Justices*, 234 Mass. 597 [127 N. E. 525]; *State ex rel. Civello v. City of New Orleans*, 154 La. 271 [33 A. L. R. 260, 97 South. 440]; *Spector v. Building Inspector of Milton* (Mass.), 145 N. E. 265; *Brett v. Building Commissioner of Brookline* (Mass.), 145 N. E. 269; *State ex rel. Morris v. Osborn*, 22 Ohio N. P. Rep. (N. S.) 549.)

It cannot be gainsaid, however, that many municipalities, evidently upon the theory that zoning is a panacea for civic ills, have, under the guise of zoning, sought to enact and enforce unreasonable and discriminatory ordinances. Some of these attempted regulations have been palpably for the exclusive and preferential benefit of particular localities. [14] The duty, therefore, devolves upon the courts to determine in each instance whether or not the ordinance, either in whole or in part, is invalid. In the determination of this problem two questions present themselves: (1) Is the scheme of zoning as a whole sound, that is to say, is the method of classification and districting reasonably necessary to the public health, safety, morals, or general welfare? And (2) Has the scheme of classification and districting been applied fairly and impartially in each instance? In the instant case it is conceded that the district in question is strictly residential and that if strictly residential districts may be established, plaintiffs have no cause of complaint.

[15] This brings us naturally to the question of whether or not there may be legally established, as a part of a comprehensive zoning plan, strictly private residential districts from which are excluded and absolutely prohibited general business enterprises, apartments, tenements, and like structures. We are of the opinion that it may be done; that the establishment of such districts as a part of a systematic and carefully considered and existing zoning plan is a legitimate exercise of the police power delegated to the municipality.

[16] It is scarcely necessary to reiterate here the well-recognized principle that courts are loath to substitute their judgment as to the necessity for a particular enactment for the legislative judgment as to the need of such enactment with reference to the exercise of the police power. A large discretion is vested in the legislative branch of the government with reference to the exercise of the police power (*Mehlos* v. *Milwaukee,* 156 Wis. 591 [Ann. Cas. 1915C, 1102, 51 L. R. A. (N. S.) 1009, 146 N. W. 882] ; *Carter* v. *Harper, supra.*) Every intendment is to be indulged by the courts in favor of the validity of its exercise, and unless the measure is clearly oppressive it will be deemed to be within the purview of that power. It is only when it is palpable that the measure in controversy has no real or substantial relation to the public health, safety, morals, or general welfare that it will be nullified by the courts. [17] The courts may differ with the legislature as to the wisdom and propriety of a particular enactment as a means of accomplishing a particular end, but as long as there are considerations of public health, safety, morals, or general welfare which the legislative body may have had in mind, which have justified the regulation, it must be assumed by the court that the legislative body had those considerations in mind and that those considerations did justify the regulation. (*State ex rel. Civello* v. *City of New Orleans, supra.*) In *Ex parte Hadacheck, supra,* the court held in effect that, when the necessity or propriety of an enactment was a question upon which reasonable minds might differ, the propriety and necessity of such enactment was a matter of legislative determination.

That there are reasonable minds which are of the belief that a regulation creating and establishing strictly residential districts is necessary and proper is evidenced by the pas-

sage of such ordinances in such widely varying parts of the Union as Massachusetts, Louisiana, New York, Kansas, Iowa, and Wisconsin. In each of these states the problem of the validity of the establishment of a strictly residential district was before the highest court of those respective jurisdictions and in each case such ordinance was held to be within the scope of the police power.

An enabling act of the state of Massachusetts authorized cities and towns by ordinance to provide "that certain kinds of dwelling houses and tenement houses shall be restricted to specified parts of the city or town, or shall be excluded from specified parts of the city or town, or that dwelling houses or tenements situated in specified parts of the city or town shall conform to certain regulations in respect to their construction or use which do not apply to such buildings in other parts of the city or town." It further provided that the city or town might be divided "into districts or zones, and the construction and use of buildings in each district or zone may be regulated. . . . " The supreme judicial court of Massachusetts held that these provisions of the act were not contrary either to the state or the federal constitution. (*In re Opinion of Justices,* 234 Mass. 597 [127 N. E. 525] ; see, also, *Building Inspector of Lowell* v. *Stoklosa* (Mass.), 145 N. E. 262.)

The fact that Massachusetts may be the only state which has authorized the passage of zoning laws by constitutional provisions does not detract from the value of the Massachusetts cases as authority. In the cases last cited the act was held not to be within the inhibitions of the federal constitution. Inasmuch as the provisions of the federal constitution relating to police power are similar to those of our own state constitution, the reasoning of those cases and those decisions are applicable to the precise question presented here. (*Carter* v. *Harper, supra.*)

The court of appeals of New York, in *Lincoln Trust Co.* v. *Williams Building Corp., supra,* held the adoption of a zoning resolution creating three districts—residential, business, and unrestricted—to be a valid exercise of the police power. The Iowa supreme court, in *Des Moines* v. *Manhattan Oil Co.,* 193 Iowa, 1096 [184 N. W. 823, 188 N. W. 921], held that a zoning ordinance establishing a restricted residential district was not in contravention of a state statute

nor the federal constitution. And the supreme court of Kansas, in *Ware* v. *City of Wichita, supra,* held that cities could plan and create reasonable zoning districts for the future systematic development of the city and provide therein for residential, commercial, and industrial districts. The supreme court of Louisiana pointed out, as do almost all of the cases dealing with the subject, the considerations of public health, safety, morals, and general welfare upon which a zoning ordinance, providing for the creation of residential, commercial, and industrial districts, may be based. (*State ex rel. Civello* v. *City of New Orleans, supra.*) The supreme court of Wisconsin, in a carefully considered opinion, has likewise upheld, and for much the same reasons, the validity of residential zoning districts. (*Carter* v. *Harper, supra.*)

The case of *State ex rel. Morris* v. *Osborn,* 22 Ohio N. P. (N. S.) 549, presents the precise point in controversy here and hence is particularly pertinent. While the decision is not one of a court of last resort, nevertheless we are in accord with the reasoning of the court in refusing a writ of *mandamus* sought by the petitioner to compel the building inspector to issue him a permit to erect certain apartment houses in a neighborhood zoned as an exclusive single and double family residence property district.

There are some decisions which do not uphold the validity of a zoning ordinance establishing strictly residential districts. We are of the opinion, however, that the better reasoned cases are in favor of the validity of comprehensive zoning which establish strictly private home districts, and that the most which can be said of the cases to the contrary is that they merely show that this is a question upon which reasonable minds may differ.

[18] In addition to all that has been said in support of the constitutionality of residential zoning as part of a comprehensive plan, we think it may be safely and sensibly said that justification for residential zoning may, in the last analysis, be rested upon the protection of the civic and social values of the American home. The establishment of such districts is for the general welfare because it tends to promote and perpetuate the American home. It is axiomatic that the welfare, and indeed the very existence of a nation depends upon the character and caliber of its citizenry. The

character and quality of manhood and womanhood are in a large measure the result of home environment. The home and its intrinsic influences are the very foundation of good citizenship, and any factor contributing to the establishment of homes and the fostering of home life doubtless tends to the enhancement not only of community life but of the life of the nation as a whole.

The establishment of single family residence districts offers inducements not only to the wealthy but to those of moderate means to own their own homes. With ownership comes stability, the welding together of family ties and better attention to the rearing of children. With ownership comes increased interest in the promotion of public agencies, such as church and school, which have for their purpose a desired development of the moral and mental make-up of the citizenry of the country. With ownership of one's home comes recognition of the individual's responsibility for his share in the safeguarding of the welfare of the community and increased pride in personal achievement which must come from personal participation in projects looking toward community betterment.

It is needless to further analyze and enumerate all of the factors which make a single family home more desirable for the promotion and perpetuation of family life than an apartment, hotel, or flat. It will suffice to say that there is a sentiment practically universal, that this is so. But few persons, if given their choice, would, we think, deliberately prefer to establish their homes and rear their children in an apartment house neighborhood rather than in a single home neighborhood. The general welfare of a community is but the aggregate welfare of its constituent members and that which tends to promote the welfare of the individual members of society cannot fail to benefit society as a whole.

The entrance of one apartment house or flat into a district usually means the entrance of others, and while it may mean an enhancement of value of the adjacent property for the building of similar structures, it detracts from the value of neighboring property for home building. The man who is seeking to establish a permanent home would not deliberately choose to build next to an apartment house, and it is common experience that the man who has already built is dissatisfied with his home location and desires a change. In

other words, the apartment house, tenement, flat, and like structures tend to the exclusion of homes. The home owner may move to another district but this may not be a sufficient solution to his problem, for if no protection can be given to strictly home districts—such as is contemplated by a comprehensive and properly constructed zoning plan—he may be forced by the ever-increasing encroachment of apartments and flats to relinquish, if not altogether abandon, the benefits emanating from a permanent home site.

Of course, the establishment of exclusive residence districts does not mean that all members of a community will perforce be compelled to live in individual homes. It simply means that by a comprehensive zoning plan such uses will be segregated to districts best suited to their development with benefit to their own locality and without detriment to the strictly home districts.

We do not wish to unduly emphasize the single family residence as a means of perpetuating the home life of a people. There are many persons who by reason of circumstances find apartment, flat, or hotel life necessary or preferable. Undoubtedly many families do maintain ideal home life in apartments, flats, and hotels. And it is also undoubtedly true that in many single family dwellings there is much of dissension and discord. It cannot be gainsaid, however, that the presence of families is usually not encouraged in apartments, flats, and hotels; and that people having children are discriminated against and in some instances actually barred. It is also a well-recognized fact that apartments, flats, etc., are noted for their transient occupancy. All these influences tend to militate against the permanence and stability of home life.

What has been said about the desirability of encouraging home life in single family dwellings as an element in the promotion of the general welfare of a community may not apply with equal force to a regulation which relates to two-family dwellings. Nevertheless the reasoning in that behalf is not wholly inapplicable to zoning regulations, having as their basis the general welfare of the community, which permit the two-family dwellings in strictly residential districts. A two-family dwelling requires no radical change of architectural design and does not entail any added burdens over the single family residences in the way of fire or health protection or the exercise of those civic safeguards on the part

of the body politic which become necessary in localities where many large apartment houses are permitted to prevail. Moreover, the permitting of two-family dwellings does not radically change the character of the neighborhood which by proper zoning regulations may be devoted to residential purposes. It should require no argument to show the clear distinction between permitting a two-family dwelling and permitting a twenty or even ten family apartment house or a number of either in a residential neighborhood. Somewhere the line of demarcation must be drawn, and it is primarily the province of the municipal body to which the zoning function is committed to draw that line of demarcation, and it is neither the province nor the duty of courts to interfere with the discretion with which such bodies are invested in the absence of a clear showing of an abuse of that discretion. In short, as previously indicated, we are not permitted to substitute our judgment for the legislative judgment. (*Brown* v. *City of Los Angeles, supra.*)

It is insisted upon behalf of the appellants that the ordinance in controversy is not what is usually designated as a general zoning ordinance, but is one creating a single exclusive residence zone. On the other hand, it is insisted upon behalf of the respondents that the ordinance is part and parcel of a comprehensive zoning plan because the ordinance itself declares that it was enacted ''in contemplation of and in conformity with a general zoning ordinance covering the entire City of· Los Angeles and which will create residence, business, industrial and other zones covering the territory within said city in a comprehensive manner; that the district described in this ordinance is provided for .in advance of the general zoning ordinance for the reason that it is a portion of the district which is to be of the highest residential class under such general ordinance; that there are at present no buildings in said district which violate the provisions of this ordinance and that the best interest and general welfare of the community will be served and the general city plan preserved by the maintenance of this district in this condition.''

[19] Obviously, the purpose of comprehensive zoning is the attainment of unity in the construction and development of a city, along lines of reasonable regulations which tend to promote the health, safety, morals, and general welfare of the community, and it is equally obvious that to accom-

plish this purpose there must be definitely in the minds of the makers of comprehensive zoning, a plan, in outline at least, sufficiently extensive so that when embodied in an enacted ordinance a reviewer thereof may say with confidence that it will redound to the welfare of the city as a whole and that any part of that plan is reasonably related thereto. [20] Of course, a comprehensive zoning plan should contemplate and provide for the planning from time to time of the execution of further details, extensions, and such modifications of existing features as unforeseen changes, occurring in the civic conditions, make necessary to the perfection and perpetuation of the plan.

[21] It is a matter of common knowledge that a zoning plan of the extent contemplated in the instant case cannot be made in a day. Therefore, we may take judicial notice of the fact that it will take much time to work out the details of such a plan and that obviously it would be destructive of the plan if, during the period of its incubation, parties seeking to evade the operation thereof should be permitted to enter upon a course of construction which might progress so far as to defeat in whole or in part the ultimate execution of the plan.

[22] It follows, it seems to us, that the fact that comprehensive zoning in the instant case had not matured to the point of being an enacted and existing ordinance, at the time the emergency ordinance in the instant case was enacted, does not detract from the validity of the latter ordinance upon the theory that there could be no assurance that the contemplated zoning ordinance would be ultimately enacted and enforced. The good faith of the council in enacting the ordinance in question is not challenged nor is it asserted that the council will not proceed in good faith to the enactment of a general zoning ordinance, and in the absence of any issue concerning the good faith of the council, the presumption of fair dealing on the part of the council and the further presumption that they will not fail in the performance of an official duty must prevail. [23] That being so, it may be fairly said, we think, that the ordinance in question, being as it declares, an initial unit in the general zoning of the city, is part and parcel of a comprehenisve plan which has relation to the welfare of the city as a whole

and, therefore, it must be held that the ordinance in question is a valid exercise of the police power.

The judgment is affirmed.

Lawlor, J., Waste, J., Seawell, J., Richards, J., Shenk, J., and Myers, C. J., concurred.

Rehearing denied.

All the Justices concurred.