[Civ. No. 8289. Third Dist. Dec. 15, 1953.]

ALBERT D'AMICO, Respondent, v. A. A. BROCK, as Director of the Department of Agriculture, etc., et al., Appellants.

Edmund G. Brown, Attorney General, and Paul M. Joseph, Deputy Attorney General, for Appellants.

Clewe & Blade for Respondent.

PAULSEN, J. pro tem.*—This is an appeal from a judgment enjoining and restraining defendants and appellants from enforcing the provisions of an order of the Director of Agriculture, purportedly issued by authority of the California Marketing Act of 1937, which attempted to prohibit the canning of Saint Agostino olives smaller in size than "Mammoth," as that size is defined in section 870 of the Agricultural Code.

For approximately 16 years prior to the commencement of this action on December 3, 1951, respondent had been a producer of that variety of olives in Butte County. During the 1951 season he harvested in excess of 200,000 pounds of olives, of which approximately 94,000 pounds were of the size denominated in the Agricultural Code as "Small," "Select," or "Standard," or larger, but smaller than "Mammoth." The reasonable market value of these olives for canning purposes was in excess of $8,500. For no other purpose were they worth more than $10 a ton, or a total of $500.

From January 20, 1951, until October 15, 1951, there was in effect a marketing order issued by the director, governing the marketing of olives in that area. This order defined the terms used therein, established an advisory board, and further provided in paragraph 2, section A of article IV, among other things, that:

". . . All olives which are 'mammoth or larger' for the Ascolano and Barouni varieties, 'giant or larger' for the Sevillano variety, 'medium or larger' for the Obliza variety, and 'Standard or larger' for all other varieties, except as provided in Paragraph 4, following, as such sizes are defined in the applicable section in the Agricultural Code, are hereby declared to be of proper quality, as to size, for canning as whole or pitted olives; but, for the protection of the interests of consumers and to attain the advertising and sales promotion objectives of this Order, all olives below such sizes are

---

*Assigned by Chairman of Judicial Council.

hereby declared to be objectionable and unfit for canning as whole or pitted olives, and are designated as 'substandard sizes.' The Board shall have authority to make necessary and proper arrangements for inspection and otherwise carrying out the provisions of this Section."

Obviously, the effect of the foregoing provision of the marketing order was to declare and establish that "Standard or larger" olives of any variety other than those therein mentioned by name were "of proper quality, as to size, for canning as whole or pitted olives."

The order provided in paragraph 4 of said section A, article IV that:

"For any variety of olives other than Missions, Manzanillos, Ascolanos, Sevillanos, Barounis or Obliza varieties, the Board may recommend and the Director may approve an appropriate minimum canning size, larger than standard size, for any such variety, as such sizes are defined in the Agricultural Code; provided that the Director finds that olives of such variety or varieties smaller than such recommended minimums are below a reasonable standard of marketable quality due to objectionable size."

Pursuant to the authority granted by said paragraph 4, on October 5, 1951, the director issued an order entitled, "Order of the Director of Agriculture Approving and Making Effective General Operating Rules and Regulations for the Marketing Order for California Canned Olives and California Green Olives as Amended 1951-1952 Marketing Season."

This order, hereinafter referred to as the "size order," after reciting the findings of the director, provides:

"(1) The minimum canning size for olives of the Saint Agostino variety shall be the mammoth size as such size is defined in the Agricultural Code of the State of California and that all olives of the Saint Agostino variety below such size are hereby declared to be objectionable and unfit for canning as whole or pitted olives and are designated as substandard in size.

"(2) Subject to the provisions of Subsection 2 of Section A, Article IV of said Marketing Order, as Amended, no processor shall prepare for market for canning as whole or pitted olives nor shall can whole or pitted olives of the Saint Agostino variety which are smaller than mammoth size as

such size is defined in the Agricultural Code of the State of California.

"(3) This Order shall become effective at 12:01 a. m., Monday, October 15, 1951, and shall continue in effect until suspended, terminated or modified."

The trial court held that the size order was invalid and enjoined defendants from enforcing it.

Respondent has at all times since the commencement of this action challenged the authority of the director to include in a marketing order a provision which would authorize him to issue, as an administrative rule or regulation, a size order such as that involved herein, without following the procedure prescribed for the adoption of a marketing order or major amendments thereto.

It is the position of appellants that the size order was not an amendment within the statutory meaning of that term but that it was an administrative order issued under the provisions of section 1300.16, subsection (f), of the Agricultural Code, and that pursuant to said subsection it was adopted in accordance with the procedure set up in the general rules and regulations implementing the marketing order. Said subsection (f) reads as follows:

"(f) Upon recommendation by the advisory board concerned the director shall have power, consistent with this act, to establish such general rules and regulations covering the operations of marketing orders as may be necessary to carry out the purposes and attain the objectives of this act or any marketing order issued thereunder. The provisions of subdivision (e) of this section relative to posting, publication, and mailing of notice and time of taking effect shall be applicable to any general rule or regulation established under this subdivision applicable to marketing orders generally. Notice of seasonal marketing regulations and other administrative actions authorized in any particular marketing order shall be given to producers or handlers in the manner and within the time required as specified in such marketing order or in general rules and regulations issued and made effective hereunder. The exercise of the powers granted to an advisory board in its administration of a marketing order made effective in accordance with the provisions of this act shall be subject to the approval of the director."

The provisions for posting, publication and mailing of notice referred to in subsection (e) do not relate to notice and hearing *before* the adoption of a marketing order or of

an amendment, but are designed to acquaint interested parties of action already taken.

The act is completely lacking in clear-cut definitions of such terms as "administrative regulations" and "major amendments," although it does state, as hereafter appears, some of the changes of a marketing order that would be considered major amendments. It is therefore necessary to examine the pertinent provisions of the act and to determine what these terms mean in the light of the purposes of the act and the effect of the practical application of the order, amendment, or regulation on those concerned and on those to be protected.

Section 1300 is a legislative declaration of the purposes of the act, and of the intention to protect the public in the marketing of agricultural commodities and promote the industry by the exercise of the police power of the state.

Section 1300.13 provides in substance that the director shall administer and enforce the provisions of the act; that in order to effectuate its purposes he is authorized to issue and enforce marketing orders regulating the marketing of agricultural commodities. Then follow detailed provisions for *prior* notice to all persons who might be directly affected by the proposed order or amendments thereto. Provision is made for accurate and inclusive lists of persons to be notified, for hearings, for the taking of testimony under oath and for the keeping of complete records of the proceedings.

Section 1300.15 provides for an advisory board composed of producers where the order affects producers, and composed of handlers where the order affects handlers. The duties of the board are confined to advice and administrative matters and may include recommendations for administrative rules and regulations as well as for amendments to the marketing order. It is then provided that:

"(b) Subject to the legislative restrictions and limitations set forth herein any marketing order issued by the director pursuant to this chapter may contain any or all of the following provisions for regulating or providing methods for regulating producer marketing or the handling or any of the operations of processing or distributing by handlers of any agricultural commodity within this State, but no others:"

Then follow provisions for the control of surpluses, for limiting and allotting quantities and other matters which cannot be construed to authorize the issuance of a size order of the nature of the one here involved without prior notice

and hearing. If such authority exists, it must be found in subsection (b), paragraph (7), of said section, which reads in part as follows:

"Provisions for the establishment of uniform grading and inspection of any agricultural commodity delivered by producers to handlers or others engaged in the handling thereof and for the establishment of grading standards of quality, condition, size or pack for any agricultural commodity, and the inspection and grading of such commodity in accordance with such grading standards so established, such grading standards for any such commodity shall not be established below any minimum standards now prescribed by law for such commodity."

Section 1300.16 sets up elaborate procedure for the adoption of marketing orders and major amendments thereto. Before either may be made effective the procedure for notice and hearing heretofore mentiond must be followed, and the director must also make findings that one or more alternative provisions for obtaining the assent of certain percentages of the persons directly affected have been complied with. It is provided that "For the purposes of this chapter a major amendment to a marketing order shall include *but not be limited to* any amendment which adds to or deletes from any such marketing order any of the following *types of regulation or authorizations:*" (Italics supplied.) Listed here are 13 types, 12 of them dealing for the most part with limitations on the handling of surpluses. Number 13 provides:

"Authority to extend the application of the provisions of any marketing order to portions or uses of an agricultural commodity not previously subject to such provisions or to restrict or extend the application of such provisions upon the producers or handlers of such portions or uses of any such commodity."

There can be no question that if the size order had added or deleted an *authorization* to do the things mentioned therein or described in said item 13, it would, by the terms of the act, have constituted a major amendment. But the size order did not purport to add an authorization, as it already contained one of that nature; it was obviously intended to be a regulation. And in this connection it is significant that, in speaking of major amendments and the 13 items included as such, the act refers to them as *types of regulations* or authorizations. This, and the fact that major amendments were not limited to the 13 types, is a recognition of the

difficulty inherent in attempting to frame definitions that will include either class of change and exclude the other.

This section also contains the following:

"Modification of any provisions of any marketing order in effect for the purpose of clarifying the meaning or application of such provisions or modifying administrative procedures for carrying out such provisions are hereby declared not to be a major amendment of such marketing order."

 It is obvious that the size order was not a "minor amendment." The original marketing order clearly permitted the canning of olives not specifically named therein that were smaller than "Mammoth." There was no doubt or uncertainty concerning the meaning or application of these provisions. The size order did not constitute a *minor* amendment.

We have a situation then where the provisions of the act do not conclusively determine the question: Was the size order merely an administrative regulation that could be made effective following notice that it had already been adopted, or was it a major amendment which was invalid because of a failure to give the statutory notice?

It is clear from a reading of the entire act that the Legislature intended to vest broad powers in the director to regulate production and marketing of agricultural commodities for the protection of the consuming public, for the promotion of the agricultural industry of the state as a whole, and also for the protection of those engaged in the industry. It is equally clear that to a large extent this was to be done on a cooperative basis, with active participation of those directly affected and in a manner that would give producers, processors and handlers an opportunity to be heard when matters of vital importance were under consideration and before action could be taken.

The original marketing order permitted respondent to grow and market his olives in the manner followed by him in preceding years. The record discloses that he had heard of the contemplated change and had protested it, but that its actual adoption occurred during the harvest season.

 This court may take judicial notice of the fact that the production of olives is a seasonal operation in a limited sense only. Trees must be planted and nurtured during the nonproductive years. Each season the operation must extend over a period of many months. It is not always possible to readjust to drastic changes made on short notice, even when

there is reason to believe they are under consideration.

When respondent, with an established orchard in operation, started preparing for the 1951 season he was justified in believing that the standards theretofore fixed would not be changed before the crop was marketed. The period of harvest was upon him when the size order was adopted on October 5, 1951, effective as of October 15, 1951.

It seems clear that the Legislature intended to confer authority upon advisory boards (when a marketing order includes the provision permitted by 1300.15 (b)(7)), to recommend, and upon the director to approve, grading standards of size greater than those already fixed by law. But it does not follow, necessarily, that the resulting order is nothing more than an administrative regulation that may be made effective without prior notice and hearing as prescribed for major amendments.

The manifest difficulty of effectuating the purposes of this act made it necessary to vest broad powers in the director, but the facts of this case again demonstrate the cogent reason for guaranteeing the right of individuals and groups directly affected to notice and to a hearing before major decisions are made. Without such a guarantee the power of the courts to act promptly when the police power is abused would, in many instances, be defeated.

The police power of the state may, at times, be harsh, and necessarily so, but that power is not unlimited, and whether there has been a reasonable exercise of it is a question for the courts. (*Miller* v. *Board of Public Works,* 195 Cal. 477 [234 P. 381, 38 A.L.R. 1479]; *Paraco, Inc.* v. *Department of Agriculture,* 118 Cal.App.2d 348, 352 [257 P.2d 981].)

In this case a means was employed which practically destroyed the value of respondent's crop after it was ready for or partly harvested. Prior to the adoption of the order no notice was given and no opportunity for a legal hearing was afforded. If the Legislature intended by the provisions of the act to vest such broad and sweeping authority in the director by means of a regulation made under the terms of a marketing order, such authorization was arbitrary and unreasonable and an unconstitutional exercise of the police power. We are of the opinion that the act should be construed in such a way as not to impute such intentions to the Legislature.

It is well settled that the court should construe legislative enactments and orders of this kind so as to uphold their

constitutionality if possible. ▌ Where two constructions, one consistent and one inconsistent with the provisions of the Constitution, are possible, the enactment or order should be construed so as to harmonize with the Constitution and comport with the legitimate powers of the Legislature. (11 Cal. Jur.2d, § 61, p. 384.)

▌ Applying the foregoing rule of construction in this case it must be held that the size order here involved was a major amendment to the marketing order and it having been made without following the statutory procedure provided for the adoption of such orders, was invalid for all purposes.

Appellants contend that the original complaint and the amended complaint made to conform to proof do not state a cause of action; that the evidence does not support the findings and the findings do not support the judgment. These contentions are based upon appellant's assertion that the size order was a mere administrative regulation and must fall with it.

The record discloses that respondent heard of the contemplated changes in advance of their adoption and protested them. Appellants now argue that he has waived his rights to notice and hearing and is estopped to question the validity of the size order.

No authority is cited to support these contentions and no facts are called to our attention that would constitute an estoppel.

The Agricultural Code imposes both civil and criminal liability on any person who violates a legally adopted order made pursuant thereto.

▌ A litigant cannot be prevented from asserting his legal rights when assailed by either criminal or civil action merely because he protested against proposed legislative or administrative changes designed to curtail those rights.

In view of the conclusions reached herein, it is unnecessary to consider other points raised in the briefs.

The judgment is affirmed.

Van Dyke, P. J., and Schottky, J., concurred.

A petition for a rehearing was denied January 8, 1954, and appellants' petition for a hearing by the Supreme Court was denied February 10, 1954. Traynor, J., was of the opinion that the petition should be granted.