[No. 20380.  *En Banc.*  June 8, 1927.]

THE STATE OF WASHINGTON, *on the Relation of Seattle Title Trust Company, as Trustee, etc., Appellant,* v. GEORGE W. ROBERGE, *as Superintendent, Respondent.*[1]

[1] MUNICIPAL CORPORATIONS (325, 327)—POLICE POWER—BUILDING PERMITS—ZONING ORDINANCES—REASONABLENESS OF REGULATIONS. A city has the right to establish zoning districts and to prohibit the erection of philanthropic institutions in the residential zone; and the courts cannot make exceptions or hold, in a special instance falling clearly within the inhibition, that the exclusion of a certain home for the aged and feeble, is arbitrary or unreasonable, in violation of Art. 1, §§ 3, 7, 12, 16, and 23 of the state constitution, and the Fifth and Fourteenth Amendments to the Federal constitution (PARKER, FULLERTON, TOLMAN, and HOLCOMB, JJ., dissenting).

Appeal from a judgment of the superior court for King county, Kinne, J., entered September 25, 1926, upon findings in favor of the defendant, in an action for mandamus, tried to the court. Affirmed.

*Shank, Belt & Fairbrook,* for appellant.

*Thomas J. L. Kennedy* and *Ray Dumett,* for respondent.

ASKREN, J.—Caroline Galland, who died in Seattle about twenty years ago, left a will in which she devised an estate of approximately one million dollars in trust to the Seattle Trust and Title Company for certain purposes, one of which was the purchase of a site for the erection and maintenance of a home to be known as "The Caroline Kline Galland Home for Aged and Feeble Poor." The will provided that those admitted to the home should be aged and feeble men and women, and the intent was that it should be

[1]Reported in 256 Pac. 781.

managed in such a way as to bring to the inmates the greatest degree of contentment and happiness in their declining years. Pursuant to the will, the trustee purchased a tract of five acres on a ridge overlooking Lake Washington, and has maintained continuously since 1914 a home thereon conforming to the testator's desires. In 1926, the trustee decided to remove the frame building used as a home thereon, and erect in its place a modern brick building having a capacity sufficient to care for twice as many inmates as the present home.

Application was made to the respondent for a building permit, which was refused upon the ground that, in 1923, the city of Seattle had enacted a zoning ordinance which prohibited the construction of a building for the intended purpose at the point desired.

Action in mandamus was then begun to compel the issuance of the permit, and after hearing, the trial court refused the writ and this appeal followed.

[1] The main contention made upon appeal does not question the validity of the ordinance considered as a whole, but raises the point of whether it is arbitrary and unreasonable as applied to the particular institution involved, and in that respect violates Art. I, §§ 3, 7, 12, 16, and 23, of the state constitution, and the Fifth and Fourteenth Amendments to the Federal Constitution.

The ordinance is too long to permit even a detailed resume of its provisions, but in brief it may be said to divide the city of Seattle into six districts, known as "use districts," and provides to what use property may be put in each district. The uses are cumulative, i. e., each district includes as permissive all those uses which by ordinance are permitted in a higher use district, but not for those of a lower use. Thus, the property in district 6 may be used for all purposes

provided therein, and also for those in the previous five districts. Likewise, property in district 5, can be used for all purposes mentioned therein and for those of numbers 1, 2, 3, and 4, but not for those of No. 6.

The building sought to be erected is to take the place of the one now on the property, and is, by ordinance, within District No. 1, known as a First Residence District. The ordinance permits in that district single family dwellings, public schools, private schools of a prescribed character, churches, parks and playgrounds, art galleries, libraries, private conservatories and railroad and shelter stations.

District No. 2, permits, along with many others, the use of property for philanthropic institutions of the character of the one under discussion. It also provides in the ordinance that:

"(c) A philanthropic home for children or for old people shall be permitted in the First Residence District when the written consent shall have been obtained of the owners of two-thirds (2-3) of the property within four hundred feet of the proposed building."

The relator was unable to secure the consent of the property owners to erect this building in the First Use District as required by the ordinance.

The ordinance also had a provision exempting the property here in question from the ordinance under certain conditions, as follows:

"(b) Subject to the provisions of Paragraph (a) and (f) of this Section, the lawful use of a building or premises existing at the time of the adoption of this ordinance, but not conforming to the provisions for the use district within which it is located may continue, provided, that no structural alterations are made, except such as the Superintendent of Buildings shall deem necessary for the safety of the building. The combined cost of all alterations and repairs in

any ten year period shall not exceed the assessed valuation of the building at the time the last allowable permit is applied for."

· It will thus be seen that, as long as relator desires to continue to use the present building for present purposes, it may do so, but that, when a new building is to be erected as is now desired, the ordinance prohibits it.

We have never been called upon to pass on the constitutionality of a zoning ordinance of this character before, and we need not enter into an involved discussion of it now, because relator has frankly conceded that the vast majority of courts have upheld zoning ordinances and the recent decision of the United States supreme court in *Village of Euclid v. Ambler Realty Co.*, U. S. Adv. Ops. 1926-27, p. 171, has set at rest the question of the right of cities to enact such legislation.

But relator finds objection to the ordinance because, as it contends, there is no justification for the placing of such an institution as the one in question in the second residence use district, and forbidding it to be erected in the first residence district.

The argument seems to be that an institution of this character is not such that it should be forbidden alongside single family residences in the first district. It is said that the character of the building to be erected is such as to beautify the grounds and therefore it will not be an eyesore to the neighbors; that the institution is carefully managed and that the inmates thereof so conduct themselves that they do not interfere with those round about them; that it will be the only one of its kind in the neighborhood, and that it will be located on a large tract of land, thereby separating the building from private dwellings by the width of the large side yards.

In determining this question, it must be remembered that the legislative authority cannot deal in myriads of details, and that its paramount duty is to determine the classification of uses. In this case, that authority has designated the class with which we have here to deal as ''philanthropic institutions.'' It is undenied that this home comes strictly under that class.

Now, must the ordinance go further and divide and sub-divide *ad infinitum* all the various degrees of the particular classification until there arrives a twilight zone where no one can say whether a given use should come within one classification or another? Or must the courts in construing the ordinance do the same thing? For instance, applying it to the present case, must we say that, while it is perfectly proper that philanthropic institutions be placed in second use districts, yet, if the particular institution desires to erect a beautiful building then it shall be taken from the second and placed in the first? Or, if the evidence shows that the inmates interfere none whatever with the occupants of adjoining residences, the class shall be changed? Or, if this be the only one in the district, the lessening of the value of adjoining property will be so slight that the class should be altered, or that if it be erected on a wide expanse of ground the contact with other persons will be small and perforce this will be a reason for changing the classification? Or, that all these things can combine in a given case and thus upset the provisions of the ordinance?

Of course, it is apparent that even the character of the buildings will change in time, and perhaps that which might be beautiful when erected will reach a point where it becomes not only an eyesore, but a fire-trap; that the inmates of today who do not molest their neighbors will be supplanted by others who may not be so meticulous of the rights and feelings of

others; that if the present building may be erected, others of like character may also be erected all over the same district, and its character as a first residence district primarily intended for single family dwellings entirely destroyed; and the wide expanse of ground which might now separate the new building from adjoining residences be either filled with additional buildings of like character by the relator or the ground disposed of to others.

It must be apparent that the most that can be said for relator's contention is that this institution is perhaps the least objectionable of all the philanthropic institutions; but when that is said, and full consideration given to the argument, it furnishes us no reason for embarking upon a whittling expedition, the result of which will carve the heart out of the ordinance, leave it indefinite and uncertain, and require every application for a different classification to be decided upon a consideration of whether the thing sought to be done is the least objectionable of its class, and whether, in view of all the circumstances, it may remain so in the years to come. Upon such a theory why might not the respondent determine that any certain applicant was the most objectionable of its class, and thereby relegate it to a lower classification?

Surely this cannot be done. Our duty is to answer two questions: First, has the legislative body power to make such a classification? Secondly, does the relator's proposed building belong to the class? Relator hardly denies that these questions must be answered in the affirmative. We conclude that they must, and there our inquiry must stop, for we shall not substitute our own judgment for the council in determining whether we, as the enacting authority, would have made the same classification or not. But it requires no argument to demonstrate that the class-

ification as such is properly made. To say that such an institution does not destroy the value of surrounding property for strictly home purposes is to deny that which we all know to be a fact, and it matters little whether the objections arise out of the conduct of the institution or its inmates or the aesthetic taste of the persons desiring to maintain homes and rear their families under congenial surroundings and influences.

The aesthetic taste is not to be frowned on nor classed as prejudice. The spirit which motivated the will to provide a home for the aged and feeble was certainly of the highest, but not all things conceived, even in the loftiest of aspirations and ideals, become thereby suitable associations in all other places or for all other purposes. Examples of this readily occur to the mind.

It remained for the United States supreme court in the case of *Village of Euclid v. Ambler Realty Co., supra,* to succinctly and clearly express this viewpoint when, in discussing this very question, it said: "A nuisance may be the right thing in the wrong place . . ."

But even if the question as to whether the classification was proper or not was one upon which there might fairly be a difference of opinion, still we would not be justified in setting it aside. In the same case the court proceeded:

"If the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control. *Radice v. New York,* 264 U. S. 292, 294. . . . Here . . . the exclusion is in general terms of all industrial establishments, and it may thereby happen that not only offensive or dangerous industries will be excluded, but those which are neither offensive nor dangerous will share the same fate. But this is no more than hap-

pens in respect of many practices—forbidding laws which this court has upheld, although drawn in general terms so as to include individual cases that may turn out to be innocuous in themselves. . . . The inclusion of a reasonable margin to insure effective enforcement, will not put upon a law, otherwise valid, the stamp of invalidity. Such laws may also find their justification in the fact that, in some fields, the bad fades into the good by such insensible degrees that the two are not capable of being readily distinguished and separated in terms of legislation."

In that case the court specifically upheld the provisions of the ordinance in question prohibiting apartment houses in the residential district. We think it must be readily conceded that an apartment house would be far more desirable than a charitable institution in a residential district.

The decision of the California supreme court in *Miller v. Board of Public Works of City of Los Angeles,* 195 Cal. 477, 234 Pac. 381, 38 A. L. R. 1479, is also illuminating, and the arguments advanced for sustaining the character of legislation so cogent that we are constrained to quote a portion of it.

"In addition to all that has been said in support of the constitutionality of residential zoning, as part of a comprehensive plan, we think it may be safely and sensibly said that justification for residential zoning may, in the last analysis be rested upon the protection of the civic and social value of the American home. The establishment of such districts is for the general welfare, because it tends to promote and perpetuate the American home. It is axiomatic that the welfare, and indeed the very existence, of a nation, depends upon the character and caliber of its citizenry. The character and quality of manhood and womanhood are in a large measure the result of home environment.

"The home and its intrinsic influences are the very foundation of good citizenry, and any factor contributing to the establishment of homes and the fostering

of home life doubtless tends to the enhancement, not only of community life, but of the life of the nation as a whole. . . .

"The entrance of one apartment house or flat into a district usually means the entrance of others, and, while it may mean an enhancement of value of the adjacent property for the building of similar structures, it detracts from the value of neighboring property for home building. The man who is seeking to establish a permanent home would not deliberately choose to build next to an apartment house, and it is common experience that the man who has already built is dissatisfied with his home location and desires a change.

"In other words, the apartment house, tenement, flat, and like structures, tend to the exclusion of homes. The home owner may move to another district, but this may not be a sufficient solution of his problem, for if no protection can be given to strictly home districts—such as is contemplated by a comprehensive and properly constructed zoning plan—he may be forced by the ever increasing encroachment of apartments and flats to relinquish, if not altogether abandon, the benefits emanating from a permanent home site."

See, also, *City of Aurora v. Burns,* 319 Ill. 84, 149 N. E. 784; *State ex rel. Carter v. Harper,* 182 Wis. 148, 196 N. W. 451, 33 A. L. R. 269; *Brett v. Building Commissioner of Brookline,* 250 Mass. 73, 145 N. E. 269; *Wulfsohn v. Burden,* 241 N. Y. 288, 150 N. E. 120, 43 A. L. R. 651; *City of Bismarck v. Hughes,* 53 N. D. 838, 208 N. W. 711; *Colby v. Board of Adjustment,* 255 Pac. (Colo.) 443; *Zahn v. Board of Public Works,* U. S. Adv. Ops. 1926-27, p. 704. Nor does the fact that the restriction made by the ordinance becomes inoperative, if the consent of two-thirds of the property owners within a given area be obtained, establish that the ordinance is unreasonable, nor does it indicate a delegation of the legislative power of the city.

In *Spokane v. Camp,* 50 Wash. 554, 97 Pac. 770, 126 Am. St. 913, there was drawn in question an ordinance of the city of Spokane which prohibited stables within two hundred feet of a residence in certain blocks, unless the consent of a majority of the owners of lots fronting on the street was obtained. It was there claimed that the provision requiring consent of property owners was a delegation of the legislative authority. We held against this contention, saying:

"In this case it may readily be seen that the council, recognizing the rights of the residents of the city to be consulted in matters purely local, matters affecting the comfort and even the health of the residents, and the right to have their will reflected in the enactments of their representatives, provided the ordinance for the purpose of meeting the desires of the residents in that regard. The ordinance is prohibitive, but leaves the right to the citizen to waive the prohibition if he chooses. Statutes of this character are common, and while it is generally conceded that the legislature cannot delegate its legislative function, it is well established that it may provide for the operation of a law which it enacts upon the happening of some future act or contingency. The local option laws in their various phases are common instances. While these laws were violently assailed, and in some instances received judicial condemnation, they are now almost universally sustained."

We conclude that the ordinance as drawn and applied is not unreasonable nor arbitrary, and that it should be sustained.

Judgment affirmed.

MACKINTOSH, C. J., FRENCH, MAIN, and MITCHELL, JJ., concur.

FULLERTON and TOLMAN, JJ., dissent.

PARKER, J. (dissenting)—I dissent. I think the zoning ordinance is an unreasonable and an unwar-

ranted interference with the rights of private property as applied to the replacing of this old home building by the proposed new building. I think this is so, because of the fact that the home has been, and will be in the future, limited in the number of its occupants to a comparatively few persons, so far as the proposed new building replacing the old building will accommodate occupants, there being no other building in connection with the home; in view of the fact that the new building will be practically fire-proof, while the old one is not; in view of the fact that the new building will be situated on the five-acre park-like improved tract with liberal open space all around it on the tract; in view of the fact that the home was established and has been maintained at this location since long before the enactment of this zoning ordinance; in view of the fact that the proposed new building with its surrounding grounds will be not only inoffensive in appearance but will be artistic and beautiful in appearance; and in view of the fact that no considerations of safety, health or sanitary conditions are in the least involved in the replacing of the old building by the new building; indeed, all such considerations point to a bettering of all those conditions by the construction of the new building. To my mind, our problem is not necessarily whether or not, speaking generally, the zoning ordinance is valid, but it is whether or not the zoning ordinance is valid as applied to this particular property and its present and prospective use. That the courts are warranted in so inquiring is, I think, abundantly shown by judicial authority.

HOLCOMB, J., concurs with PARKER, J.