Common Pleas Court of Franklin County.

STATE, EX REL., V. MCCUNE, DIRECTOR OF PUBLIC SAFETY.

Decided March 2, 1928.

*Randolph Walton,* for relator.
*Charles A. Leach,* city solicitor, for defendants.

KING, J.

The relator in her petition in substance states that she is a *bona fide* resident of the city of Columbus, Ohio, and that she is more than 21 years of age; that she entered into a contract with Cy Hills, doing business under the name of Cy Hills' Fifty Cent Cab Company in the city of Columbus to drive a taxicab in said city; that under the contract of employment she was to work as such taxicab driver for a period of only eight hours per day during the daylight season; that the taxicab which she was to operate was a small Essex Coach, and that such employment was healthy, proper and well suited to the relator; that said employment consisted in driving said taxicab in and about the city of Columbus in the transportation of passengers for hire; that she was qualified to perform such employment, and that such employment is not detrimental to the health or welfare of relator, nor contrary to the health, safety, morals or welfare of the public.

Relator further alleges that in accordance with the provisions of Sections 6 and 7 of Ordinance Number 33892 of the city of Columbus, she made application for license to drive a taxicab in said city.

The provisions of said ordinance are as follows:

"Sec. 6. *Drivers' Licenses; Applications for*—No person shall be given a driver's or chauffeur's license unless such person: (a) Be of the age of twenty-one years or over, an American citizen and a bona fide resident of the county of Franklin for ninety days next preceding the date of such application. (b) Be of sound physique, with good eyesight, and no bodily or mental infirmities which render him unfit for the safe operation of a public vehicle. (c) Be clean in dress and person and not be addicted to the use of intoxicating liquors or drugs."

"Sec. 7. *Forms and Terms of Drivers' License*—Upon satisfactory fulfillment of the foregoing requirements there shall be issued to the applicant a license which shall be in such form as to contain the photograph and signature of the licensee, a blank space upon which a record may be made of any suspension or revocation. Any licensee who defaces, removes or obliterates any official entry made upon his license shall be punished by the revocation of his license."

Relator says that she possessed the qualifications and complied with the conditions prescribed and set forth in Section 6 of said ordinance; that the auditor of the city of Columbus accepted her application and the license fee; that a receipt therefor was issued to her by said auditor, and that she entered upon the performance of her duties as a taxicab driver for the said Cy Hills' Fifty Cent Cab Company and continued in said employment until the 15th day of December, 1927, when defendants disapproved relator's application and refused to issue license to her. Relator further alleges that John P. McCune, Director of Public Safety, in disapproving and returning said application for license, gave his reasons for so doing and noted them upon the application, as follows, to-wit.:

"Application conforms in all respects to ordinance requirements, but I cannot approve on account of Statute 1008-1 Ohio Code."

Relator claims that the action of the Director of Safety refusing to issue her a license to drive a taxicab is violative of her rights as guaranteed under the Constitution of the United States and the state of Ohio.

Relator seeks to compel the defendant to issue to her a driver's license to operate a taxicab for hire on the public streets of the city of Columbus.

To the petition, defendants filed a demurrer.

The facts are undisputed. It is admitted that plaintiff had satisfactorily met and fulfilled each and every qualification prescribed by ordinance governing the issuing of driver's or chauffeur's license. It is admitted that the sole reason for withholding a driver's or chauffeur's license to the relator is because the provisions of Section 1008-1 prohibits the employment of females as taxi drivers for hire. It is admitted that plaintiff had satisfactorily met each and every qualification prescribed in the city ordinance fixing the qualifications of those to whom driver's or chauffeur's license may be issued. It is admitted that the ordinance itself does not discriminate against women.

Relator contends that Section 1008-1 is unconstitutional. The defendant justifies the refusal to grant the license upon two grounds:

1. That statute prohibiting females from operating taxis, being Section 1008-1 is a valid and proper exercise on the part of the state of the police power.

2. That defendant has absolute control of its streets and may grant or withhold the privilege or license of operating a taxi upon its streets for hire as it pleases.

The right to the relief as prayed for by the relator, in the last analysis, depends upon the construction of Section 1008-1 of the General Code, or that portion of it which is applicable to the driving of taxi cabs by females.

Section 1008-1 of the General Code provides as follows:

"Sec. 1008-1. *Occupations in which employment of female prohibited; penalty.* The employment of females in the following occupations or capacities is hereby prohibited; to-wit.: as crossing watchman, section hand, express driver, moulder, bell hop, taxi driver, jitney driver, gas or electric meter reader, ticket seller, except between the hours of six o'clock a. m., and ten o'clock p. m., as workers

in blast furnaces, smelters, mines, quarries, except in the offices thereof, shoe shining parlors, bowling alleys, pool rooms, bar rooms and saloons or public drinking places which cater to male customers exclusively and in which substitutes for intoxicating liquors are sold or advertised for sale, in delivery service on wagons or automobiles, in operating freight or baggage elevators, in baggage handling, freight handling and trucking of any kind, or in employments requiring frequent or repeated lifting of weights over twenty-five pounds. Any violations of the provisions of this section shall be punished as provided in Section 1011 of the General Code."

The question to be determined, therefore, is:

Is the depriving of an adult woman of the right to contract for her labor in the driving of a taxicab an unreasonable, arbitrary and unwarranted exercise of the police power? Does it violate a right of the relator guaranteed her by the Constitution?

If the public safety, welfare or health is served by such an enactment it would constitute a proper exercise of the police power, or, if the occupation prohibited is of such a character that a woman because of her physical being could not engage in it without injury to her health, such legislation could not be deemed unreasonable and arbitrary. The act of the General Assembly, therefore, prohibiting, as it does, woman from driving a taxicab must meet these conditions in order to be sustained.

Women have the same inherent and inalienable rights as men guaranteed to them under both federal and state Constitution. The constitutional provision that "All men are by nature free and independent and have certain alienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property and seeking and obtaining happiness and safety," applies to women the same as men.

The emancipation of women from her political, industrial and civil fetters has been a slow, and for her, a difficult process; but today the rights of women must be as fully recognized as the rights of men.

Previous to her emancipation the rights of women were governed by the principles of the common law. The un-

married woman in most respects enjoyed the same legal rights as a man, but custom required her to marry early and with marriage, she virtually lost her separate identity in the eyes of the law. She could not contract on her own count, she lost control over her real property during the existence of the marital relationship, the title to personal property was forfeited, a husband had the right to control his wife's conduct and any wages that she earned outside the home could be appropriated by him.

In 1879, an Ohio judge said:

"Our courts adjudicate primarily upon property interest. A husband has a pecuniary, a property interest in his wife * * * can a husband sue his wife if she refuses to support him out of her property or to keep her marriage contract? Not at all. Can a father sue his minor child that refuses him obedience and service. Not at all. And why? * * * For the same reason that he cannot sue his flocks or his herds, his oxen and his cattle. They are his, his to command. * * * He can sue anyone who takes them away, keeps or harbors them, anyone who injures them, because they are his own, but the wife does not own the husband. The husband is head of the family; not the wife of the husband."

In Ohio, as is true in practically all of the states of the Union, since the act of March 9, 1887, such discriminations or barriers against women have been eliminated. All of the wife's property is now under her control. Her contracts are binding in law and all legal remedies are open to those who enter into contracts with her. Her property rights and power to contract are now precisely the same as those of a man or an unmarried woman.

In 1840, the denial of several women delegates from the United States to participate in a World's Anti-Slavery Convention in London, because of their sex, provoked the American women to organize a crusade for equal rights. Consequently, there assembled on July the 19th, 1848, at Seneca Falls, New York, the First Women's Rights Convention. The delegates drew up a declaration of sentiments patterned upon the Declaration of Independence. . .

They asserted "that all men and women are created free and equal," and demanded equality with the male sex be-

fore the law in educational and economical opportunities and in voting. (Schlessinger's Political and Social History of the United States.)

Calhoun in his social history of the American Family says that during the Beecher trial the Hon. William M. Everetts defined women's legal position as one of subordination, declaring, "that notwithstanding changing customs and amenities of modern rights, women were not free, but were held in the hollow of man's hand to be crushed at his will." In confirmation he referred to a decision of the New York Court of Appeals and gave his own sanction to the principle. Public sentiment went slowly in the matter of women's progress. It was not until the last half of the Nineteenth Century that the puplic mind warmed rapidly to the advancement of women's rights.

Higher education for women was frowned upon, until within comparatively recent years. Countless arguments were advanced against it. It was claimed that higher education of women constituted "A supreme menace to the future of the race."

In 1837 the first women's seminary of college rank, Mt. Holyoke, was owned by Mary Lyon in Massachusetts. In 1821, Emma Willard opened a seminary for girls in Troy, New York. By 1860 there was sixty-one such educational institutions. Co-education was thought more adventuresome. Oberlin College in 1833 and Antioch in 1835 in Ohio were the first colleges in which women were admitted to co-education. Ohio State University was the first State University to admit women. This occurred in 1858. At Oberlin, as late as 1870, it was considered improper for a woman to address a mixed audience. In 1867 at a medical university a man said, "A young lady that studies anatomy unsexes herself." The same obstacle and barriers have been made in her entrance into the industrial field.

Calhoun in his Social History of the American Family says that in the course of the Civil War it was urged that women should enter the trades and professions. Writers such as Gail Hamilton urged the higher education of women, their right to be educated the same as man, to enter the same pursuits, receive the same wages, occupy the

same posts and professions, wield the same influence, and in a word, be independent of man as to means of support. Already it was observed that the opening of careers to women safeguards against the distress in case of the husband's death, gives security to marriage and obviates domestic parasitism.

A. C. Cameron in an address delivered at the National Labor Congress to the working men of the United States in 1867 said, "When women are qualified for the work they are entitled to be treated as the equals of men and to receive the same compensation," and urged the working men to protect them against unfair discrimination.

While the constant struggle by women throughout the years for a full recognition of her "rights" and "equality," finally resulting in the adoption of the 19th Amendment giving equal suffrage, has no direct bearing upon the constitutionality of the provision of the statute prohibiting women from driving a taxicab; however, mindful of the prejudices and unwarranted discriminations of the past, the court should, when the General Assembly has by legislation prohibited her from exercising a natural right which under the constitution is guaranteed to the opposite sex, namely, the right to contract for services, look carefully to see if such prohibition is warranted. In other words, is the legislation the result of a consideration of the public safety, health and morals, or on the contrary, is it an unreasonable, arbitrary denial founded only in prejudice or perhaps in a desire to serve a selfish purpose.

Thus it will be observed that the policy of legislation has been to enlarge the rights of women and place them with reference to the various activities of life upon an equality with men, subject only to such restrictions or limitations as are for the common good and welfare.

Section 1 of the 14th Amendment of the Constitution of the United States provides:

"No state shall make or enforce any law which shall abridge privileges or immunities of citizens of the United States, nor shall any state deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the law."

The right to contract is a part of the liberty of a citizen which is protected by the 14th Amendment to the Constitution of the United States, and cannot be interfered with arbitrarily.

The Supreme Court in the case of *Palmer* v. *Crawford,* 55 O. S., at page 441, Judge Burkett says:

"Contracts and compacts have been entered into between men, tribes and nations during all time from the earliest dawn of history, and the right and liberty of contract is one of the inalienable rights of man, fully secured and protected by our constitution, and it may be restrained only in so far as it is necessary for the common welfare, and the equal protection and benefit of the people. That such restraint of the right and liberty of contract is for the common public welfare, and equal protection and benefit of the people must appear, not only to the General Assembly, by force of popular clamor, or the pressure must be so clear, that a court of justice in the calm deliberation of its judgment, may be able to see that such restraint is for the common welfare and equal protection and benefit of the people."

Judge Burkett further observed that the usual and most frequent means of acquiring property which is guaranteed by the constitution is by contract, and one of the most valuable and sacred rights is the right to make and enforce contracts.

The word "liberty" as used in the first section of the bill of rights does not mean a mere freedom from physical restraint or state of slavery, but is deemed to embrace the right of every person to be free in the enjoyment of his faculties with which he has been endowed by his creator is the securing of his own welfare and happiness, subject only to such restraints as are necessary for the common welfare.

Section 1 of the bill of rights reads:

*Right to freedom and protection of property.* "All men are by nature free and independent and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring and protecting property and seeking and obtaining happiness and safety."

That this guarantee applies to women as well as men in

its guarantee cannot be denied. The liberty of making contracts is absolutely essential to the acquisition, possession and protection of property. 25 Am. St. Rep. (Note 881.)

The court said in the *Wheeling Bridge & Terminal Railroad Company* v. *Gilmore,* 8 C. C., 865:

"The doctrine is generally recognized and enforced that every person living under the protection of the government has the right to follow such occupation or industrial pursuit as to him seems fit provided it is not injurious to the morals, health, safety or welfare of the public, and such persons generally are entitled to the equal protection of the laws in respect to person and property."

In *Commonwealth* v. *Perry,* 155 Mass., 117, Judge Knowlton in the opinion says:

"There are certain fundamental rights of every citizen which are recognized in the organic law of all our free American states. A statute which violates any of these rights is unconstitutional and void even though the enactment of it is not expressly forbidden. * * * Among the natural and inalienable rights of men is the right to acquire, possess and protect property. * * * The right to acquire, possess and protect property includes the right to make contracts which shall be under the protection of the law."

In the case of *Alma Coal Company* v. *Cozad,* 79 O. S., 348 and 356, the court says:

"It is indispensable to the valid exercise of the police power that every invasion of a private right must be vindicated by a consideration of the public weal."

"The right to labor or to employ labor and to make contracts with respect thereto upon such terms as may be agreed upon besides being a private right is incident to the freedom of the individual, and is as fully protected by the law as any other personal or private right. All laws which limit one in his choice of trade or profession or confine him to a specified locality are infringements upon his fundamental rights of liberty." 6 R. C. L., 269.

In the case of *Miller* v. *Public Works,* 195 Cal., 477, the court says:

"The extent of the exercise and application of the police

power of the state is determined by a consideration of the question of whether or not any invocation of the power in any given case, and as applied to existing conditions, is reasonable and necessary to promote the public health, safety, morals or general welfare of the people of the community."

"Police power can be exercised to suppress, restrain or regulate the liberty of individual action only when such action is injurious to the public welfare." *Replogle* v. *Littlerock*, 166 Ark., 617.

In the case of *Terrace* v. *Thompson*, 263 U. S., 192, the court says:

"The right to earn a livelihood by the ordinary occupation of life is protected by the Constitution."

Cooley in his work on constitutional limitations at pages 1236-7 speaks with reference to restrictions imposed upon the right of the individual to contract as follows:

"But restrains upon such a freedom must not be arbitrary or unreasonable. Freedom is the general rule and restraint the exception. The legislative authority to abridge can be justified only by exceptional circumstances."

With reference to the right of a person to engage in any lawful business, it is stated at page 222 of 6 R. C. L. that

"Yet the Legislature cannot forbid any person or class of persons, from engaging in a lawful business, nor can it deprive any citizen of his right to pursue a calling, occupation or business not necessarily injurious to the community, who is willing to comply with all reasonable regulations passed upon it. * * * Hence, it is that a statute cannot be upheld as a police regulation, which confers no benefit to the public or any portion of the community, and results only in injury by prohibiting citizens from following a beneficial vocation. The legislature may regulate when regulation will protect, but may not suppress when inhibition will injure the party pursuing the lawful vocation, and proper regulation will prevent injury to others. The test of the power is found in the effect the pursuit of the calling has upon the public weal rather than in the inherent nature of the calling itself."

Can it be said that the driving of a taxi by an adult female person in the daylight season and only eight hours per day is inimical to the common welfare, health, safety

and good morals of the people? Does the necessity for such a prohibition so clearly exist that, as Judge Burkett in the case *supra* observed:

"A court of justice in the calm deliberation of its judgment may be able to see that such restraint is for the common welfare and equal protection and benefit of the people?"

We think not.

The occupation is a perfectly lawful one. It cannot be said that the occupation is in any sense immoral. In our opinion, the ethical and moral standards of the occupation would be elevated, not lowered, by permitting females to engage therein. Such has been the result where women have entered industrial activities. The safety of the public is not in the least endangered by this class driving taxicabs. On the contrary, we venture the opinion that more careful and considerate driving would result. The provisions of the ordinance provide a reasonable safeguard so far as the safety of the public is concerned in the driving by women of motor vehicles. The women making application must be of sound physique, with good eyesight and no bodily or mental infirmities which renders her unfit for the safe operation of a public motor vehicle, and also that such applicant must not be addicted to the use of liquors and drugs. As already observed, the relator possessed the qualifications prescribed by the ordinance. It cannot be successfully argued that women are not physically capable of operating a motor vehicle and therefore should be prohibited from so doing. I venture that daily at least 15% of the motor vehicles operated upon the public streets and highways are driven by women, and further, that less accidents occur from careless and reckless driving by women, than by men. All that is required of the operation of a motor vehicle is good judgment, a clear brain and eye and a consideration for the rights of others. We feel, generally speaking, that women as a class, possess such qualifications. We recognize the fact that women's physical structure is such that with reference to "some of the burdens which rest upon her in some employments" there is a justification for legislation which seeks to protect her.

.The earlier decisions, however, refuse to recognize this as a basis of distinction or difference and would not sanction any interference in the way of regulation, in her freedom of employment. Courts now recognize the power existing in the Legislature to make reasonable regulation in the employment of females and recognize her physical being as forming the basis or reason for regulation.

Counsel for relator in his brief cite the case of *People* v. *Williams*, 189 N. Y., 131, which reflected the greater weight of judicial expression at that time of the power of a legislature to regulate the employment of adult women in lawful occupations. The court in that case said:

"A statute providing that adult females shall not be employed or permitted, or suffered to work in a factory before 6 o'clock in the morning, or after 9 o'clock in the evening, is an undue restriction upon the freedom of contracting and cannot be upheld as an exercise of the police power."

The court in its opinion further says:

."And shall we say that this is a valid legislation which closes the doors of a factory to her before and after certain hours? I think not. * * * So I think, in this case, that we should say, as an adult female is in no sense a ward of the state, that she is not to be made the special object of the exercise of the paternal power of the state and that the restrictions here embodied upon her privilege to labor, violates the constitutional guaranty. In the gradual course of legislation upon the rights of women, in this state, she has come to possess all the responsibilities of the man and she is entitled to be placed upon an equality of rights with the man."

The court in this case held that it was not a valid exercise of the police power to prohibit women from working in the night season on the basis of her physical being. This was, however, modified and distinguished in the case of *People* v. *Charles Schweinler Press*, 214 N. Y. Reports, 395, in which case the court considered an act of the General Assembly very similar to the one decided in the Williams case, which provided as follows:

"In order to protect the health and morals of females

employed in factories by providing an adequate period of rest at night, no woman shall be employed or permitted to work in any factory in this state before 6 o'clock in the morning or after 9 o'clock in the evening of any day."

The court said that such a statute was constitutional as a police regulation in the interest of public health and the general welfare of the people. The court in arriving at this decision stated that the original statute was amended and also that the legislation was preceded by an investigation showing that night work by women was especially injurious to them and the request made to the legislature by its own agency the Factory Investigating Commission, based on investigation of actual conditions and study of scientific and medical opinion that night work by women in factories is generally injurious and ought to be prohibited.

The court in the course of its opinion upholding this legislation which regulated the hours of labor for women out of the consideration of her health, said:

"Of course, we are well aware that the process of justifying a new step by the fact that it makes but a short advance over the last preceding one if continued long enough may lead to extremes which cannot be approved."

If the General Assembly in the act under consideration had limited the driving of taxicabs by adult females to a certain number of hours per day and prohibited her from engaging in said occupation in the night season, such would be in accord with the decisions. The same session of the General Assembly twenty days after the passage of Sec. 1008-1, did enact present Sec. 12996, regulating the hours per day and days per week during which women under 21 years of age might be employed as a "driver or chauffeur." But to prohibit adult women wholly from driving, we feel is going to the "extreme" and is an unwarranted discrimination. It is not because of any consideration for her health. Driving a taxicab eight hours in the day season is surely more beneficial to her health than employment in factories where the same advantages for air and light, notwithstanding regulations, do not obtain. In our opinion,

the woman who does the family washing in the old fashioned way with a washboard is subjected to greater physical strain and injury to her health than the driving of a taxicab, and yet who would say that the state could compel each woman to be furnished with an electric washer or ironer? And again, the physicians decried pedaling of an old fashioned sewing machine by the woman who does the sewing for the family as injurious to her physical being. It would be just as reasonable for the General Assembly to pass a law prohibiting women from operating the old fashioned sewing machine as to prohibit her from driving a taxicab. Women operators of elevators are permitted and regulated by law; from the viewpoint of health, in some respects such occupation is more harmful than the driving of a taxi.

In a number of other states employment of females over 21 years of age as messengers in the delivery of goods or messages is permitted under regulation as to hours and time of work. In Ohio only minor women are prohibited from employment in the personal delivery of messages. In a number of cities women are drivers of milk wagons.

In New York females over 21 are employed as general conductors in the operation of surface, electric, subway and elevated railway cars and trains, the hours and time of work being regulated. In no state which we have examined has there been any attempt to prohibit the employment of women in the various occupations, the General Assembly going no further than the regulation of employment, prescribing the conditions and limitations of her employment.

We therefore conclude that Section 1008-1 so far as it prohibits adult females from driving a taxicab is not a valid exercise of the police power and therefore unconstitutional to that extent.

The contention of relator that Sec. 1008-1 was impliedly repealed by the subsequent enactment of Sec. 12996 G. C. permitting and regulating the employment of minor women as "drivers or chauffeurs," the latter act being inconsistent with the former, seems well founded, but inasmuch as we hold Sec. 1008-1 to be invalid and unconstitutional there

is no need to enlarge upon and discuss that phase of the case.

We now consider the contention made by the defendant that mandamus does not lie to compel the issuance of a license to relator for the reason that the operation of a taxi for hire upon the streets of the city is the seeking of a privilege or license that may be granted or withheld, as the city sees fit.

Section 7 of ordinance number 33892, *supra,* provides as follows:

"Upon said fulfillment of the foregoing requirements there shall be issued to the applicant a license."

The ordinance makes no discrimination against females. If a female makes application and meets the requirements of the provisions of the ordinance, as is admitted that the relator did, the administrative officers of the city cannot arbitrarily withhold the issuance of such license.

We call attention to the case of *People, ex rel. Hultman et al.,* v. *Gilchrist,* Commissioner of Department of Licenses (Twentieth Century Brown & White Taxicab Assn., Inc., Intervener), a case which is analogous to the one at bar, wherein the court says:

"Refusal by a city commissioner of license to issue license to operate taxicabs, on the ground that the right of a certain taxicab company to use the colors brown and white in a particular combination, had been established by the courts, and in the interest of the public welfare, and to protect the public against the deception arising out of simulation thereof held arbitrary, and based on false information justifying issuance of a writ of mandamus."

"Mandamus will not lie to compel the performance of a power the exercise of which lies in the discretion of the officer against whom the writ is sought; but, if his action is arbitrary, tyrannical or unreasonable, or is based on false information, the relator may have a remedy to right the wrong which he has suffered—'arbitrary' being defined as 'not governed by any fixed rules or standard.' "

"The exercise of the jurisdiction to grant mandamus lies in the sound discretion of the court."

Let the demurrer be overruled and a writ issued in accordance with this opinion.