[Crim. No. 2292. Second Appellate District, Division Two.—January 13, 1933.]

In the Matter of the Application of S. H. ALEXANDER for a Writ of Habeas Corpus.

Goldstone & Garbus for Petitioner.

Erwin P. Werner, City Attorney, Frederick von Schrader, Assistant City Attorney, C. N. Perkins, Deputy City Attorney, Charles P. Johnson, City Prosecutor, and Joe W. Matherly and John Bland, Deputies City Prosecutor, for Respondent.

Peirson M. Hall, B. P. Calhoun and Donnell G. Montgomery, as *Amici Curiae* on Behalf of Respondent.

WORKS, P. J.—An ordinance of the city of Los Angeles denounces as criminal the acts of those who "conduct, main-

tain, operate or advertise at retail any fake sale of goods, wares or merchandise'' within the municipality. The enactment, in section 2 thereof, defines a ''fake'' sale, among other specifications, thus:

''(2) The sale of goods, wares or merchandise, or the offering of goods, wares or merchandise for sale in limited quantity or quantities of less than the full amount of such merchandise, owned or carried in stock by the person . . . offering the same for sale.

''(3) The sale or offering for sale of goods, wares or merchandise of a different quality, or brand, and/or bearing a different trade mark as a substitute for merchandise previously advertised for sale. . . .

''(5) The sale or offering for sale of any goods, wares or merchandise which is contingent upon the concurrent purchase or sale of any other article.''

Petitioner is detained by the chief of police of the city of Los Angeles under and by virtue of a warrant issued out of the municipal court charging him with a violation of each of these subdivisions of section 2 of the ordinance, which have behind them the provision that it is unlawful to conduct, maintain, etc., a ''fake'' sale as defined by them. He contends that it is unconstitutional to denounce as a public offense any of the acts catalogued in the defining subdivisions. To our minds a perfunctory reading of the ordinance leads to a belief that this claim of unconstitutionality is well founded, but to justify this statement let us first examine each of the branches of the definition of a ''fake'' sale. We shall follow that examination by remarks pertinent to the subject. Hereafter we shall often designate each of the subdivisions merely by its number.

Under (2) a merchant cannot sell or offer to sell a limited quantity—and this is without restriction as to how or where the limit shall be placed—of any particular kind of merchandise he may have in stock. Specifically, if one possesses a thousand cakes of soap of a certain brand he may not sell or offer nine hundred of them, thus leaving one hundred for later coming families who habitually patronize him, or even hoarding a few cakes for the use of his own family and relatives. Indeed, he could not sell or offer any but the thousand cakes, for he may not dispose, etc., of a quantity or of quantities ''less than the full amount of such merchan-

dise, owned or carried in stock by'' him. This subdivision may have the effect to outlaw the business of retailing merchandise. Every concern may be made by it, if it were constitutional, a wholesaler, and not only so, but a wholesaler who must dispose of his entire stock of each kind of his goods or wares to the first comer who asks it. And this, irrespective of his desire to satisfy the needs of other regular patrons, his desire to hold for a reasonable time a part of his stock for a better market, his desire, indeed, to continue in business, for if one comer may take all of his Ivory soap another may take all his peanuts, and so on to the end.

Under (3) a merchant may not offer or sell to a patron a kind of baking powder which he has not advertised for sale as a ''substitute'', whatever that word may mean as employed in the ordinance, for a baking powder which he has advertised. Apparently, if a grocer advertises one kind of baking powder he must advertise all kinds he has in stock, or suffer possible pain under the ordinance. And consider for a moment, also, the possible fate of the poor merchant under (3), and pursuant to certain circumstances. If a customer expresses a desire to purchase a particular brand of baking powder which a grocer has not advertised, others having thus been offered by him to the public, he is punishable if he stoops to satisfy this apparently reasonable request. This possibility, it is true, depends upon the meaning of the word ''substitute'', as it appears in (3). The paragraph does not inhibit the sale of one thing to a particular person who has asked for a thing previously advertised.

If we look to (5) we observe that a merchant may not say to a customer, however much his offer may redound to the benefit of the latter, ''I will sell you a pound of onions for'' so much ''if you will take a pound of beets for'' so much. Indeed—scan with care the last four words of (5)—if the wife of the grocer has at home in apartments above his store a partially worn and wholly unneeded electric flatiron, the merchant may not say to a customer who requires such an implement, ''I will sell you our old flat iron for'' so much ''if you will buy a can of sardines at'' so much. And observe, especially, that (5) contains nothing as to the price of articles sold together, whether too much or too little is charged for both or whether too much is charged for one

and too little for the other. It thus clearly appears that (5), if constitutional, makes it unlawful to sell two articles together, where a price fair to both seller and buyer is fixed as to each. Also, under (5), who is to make the combination of sales "contingent", the seller or the buyer?

As this ordinance has been so peculiarly drawn—is so skeletonic and general in form—it becomes proper to inquire what was the evil sought to be remedied by it, for as early an authority as Blackstone has said in his "Commentaries on the Laws of England" that such an inquiry is proper whenever it is sought to interpret any statute. In pursuit of this quest we quote somewhat liberally from the briefs.

Upon this subject we find only these generalities in the brief of respondent:

"Merely because a dealer in merchandise is prohibited by law from engaging in certain business practices which are tinged with fraud or assume the character of fraudulent transactions is not *per se* a prevention of his right to acquire, possess or protect his property. There is no arbitrary curtailment of a citizen's right to carry on business and trade relations by the enactment of an ordinance which prohibits unfair and fraudulent transactions. Such legislation is in fact a protection to property rights guaranteed by the fourteenth amendment to the Constitution of the United States rather than a violation of that property right. The freedom of contract is subject to a variety of restraints, and the exercise of legislative authority to abridge it can be justified by the existence of exceptional circumstances."

The friends of the court, who align themselves with respondent, become more specific:

"The practice of securing trade in retail stores through the use of fake sales, as defined by this ordinance, has grown to the place where it has become a menace that is recognized and being discussed and considered throughout the nation. The ill effects of this practice are manifold. It strikes at the purchaser who takes the 'bargain bait', at all legitimate retailers, at banks and landlords, at wholesalers, jobbers and producers of raw materials, at employees of all of these groups, and finally at the general public composed of all retailers, purchasers, jobbers, wholesalers, producers, employers and employees, landlords and tenants.

Space will only permit of setting forth a few of these evils, as follows:

"(1) It is conceded that retail merchants are in business to sell at a profit and not just to sell standard articles at a loss and to thus have so-called profitless-prosperity. Limited sales are used because they enable a retailer to attract purchasers with sales of standard, well-known articles, with a known value and quality, at prices which are unreasonably low but under conditions where the retailer can limit his loss on these articles by selling only enough to each customer to serve as customer attraction or bargain bait. Of course it stands to reason that if A sells White King Soap at a loss, for example, of 1¢ a cake, he must make up that loss by sale of other articles which are not branded and hence the value and quality are not easily ascertainable by the purchaser, or by articles with brands which do not represent a known or given standard, at prices which make up to the price-cutter his loss on the bargain bait—or he must make up that loss by passing the loss along to the landlord by reduced rents—or to his employees by reduced pay— or to the producer by reduced prices for his goods, who in turn must continue the vicious circle of absorbing his loss by passing it on. Consequently it is clear that the bargain-hunter generally does not secure a bargain in the long run; however, this opportunity for fraud by kiting the prices of 'blind articles' (articles on which it is not easy for the purchaser to compare prices and quality) is the smallest evil connected with this practice.

"(2) The practice of price-cutting of standard articles which is made possible through limited sales, contingent sales, or brand substitutions, does material damage to manufacturers and to their products with consequent losses to all parties employed by or dealing with the manufacturers. For example, a manufacturer develops his business by making a dependable, standard article with a set quality, to be sold at a fair profit; he spends money to advertise the article and build up in the public mind confidence that in purchasing that given brand they will secure a meritorious product; he nurses his business through its early stages by taking small profits or absorbing losses, by making small shipments, by taking credit losses and what not. In the development of this business he makes capital investments,

he buys or leases buildings and equipment, secures employees whose livelihood is dependent upon the continuation of his business. He incurs liabilities with banks, landlords and producers of raw materials. These in turn incur liabilities and make investments, relying upon the fulfillment of his contracts to enable them to fulfil theirs, and so on, creating a condition conducive of the general welfare of the community. He sells his products to retailers upon the representation that he is advertising the article for sale at a price which gives the retailer a fair opportunity to profit on his investment. Now, along comes some greedy retailer with a group of fake sale schemes, as defined in this ordinance, and, taking advantage of the demand created by the manufacturer for his article by maintaining a standard and by advertising, buys up a quantity of the article and sells it under some limited sale plan at cost or less than cost —and what happens? The general buying public is no longer willing to pay a fair price for the article because they can now get it cheaper. Other retailers who have stocked the article in good faith must sell it out at a loss or allow it to become a dead investment on their shelves. The manufacturer has lost his territory, for his product will no longer sell for a profit in that territory—merchants will not stock it or, if they do, will only handle as little as they can—they will be forced to push other brands which carry a profit with them. Consequently the manufacturer cannot keep up his volume so he must lay off men, he must cancel orders for raw material, and he very likely will be enabled to keep up his credit obligations. This begins a series of retrenchments with everyone he deals with. The losers are the competing retailer, his employees, creditors and landlord.; the manufacturer, his employees, creditors and landlord; the producer of raw material, his employees and creditors. Continued repetition of these practices commonly causes the bankruptcy of both the manufacturer and the retailer, the loss of employment by the employees of both, and finally the loss is spread to the taxpayer, who must care for the unemployed and who must also absorb the loss of tax income from properties vacated by the retailer and the manufacturer.''

We are not prepared to doubt the existence of the evils portrayed in these quotations from the briefs. If they do

exist it is our duty to see in their prevalence the basis upon which the city council of Los Angeles has founded the enactment of the ordinance before us and to uphold it if we can. "The courts may differ with the legislature as to the wisdom and propriety of a particular enactment as a means of accomplishing a particular end, but as long as there are considerations of public health, safety, morals or general welfare which the legislature may have had in mind, which have justified the regulation, it must be assumed by the court that the legislative body had those considerations in mind and that those considerations did justify the regulation" (*Miller* v. *Board of Public Works*, 195 Cal. 477 [234 Pac. 381, 385, 38 A. L. R. 1479]).

The law as stated in the case cited can only refer to a legislative enactment which on its face shows at least the semblance of an endeavor to denounce the evils which it is sought to cure. We think the ordinance here in question cannot be placed in such a category, for it inhibits acts which may be entirely innocent as well as those which may be guilty. It is certainly unconstitutional, on several grounds, in so far as it attempts to wreak the vengeance of the law upon those who commit acts innocent in themselves because performed without fraudulent or guilty intent. Whether under the ordinance an indictment or information could so be drawn as to show a guilty act or acts we leave to the experts on criminal pleading. Certainly the three charges here made are not of that character.

It was alleged, as charged in the petition, that petitioner violated the provisions of (2) by "advertising the sale of, and offering for sale, sugar and White King soap and Crystal soap in limited quantities of less than the full amount of such sugar and White King soap and Crystal soap then owned and carried in stock" by him. This charge is the veriest conclusion of the pleader, but it is as good as (2) itself. Why was not the advertisement set forth? Did petitioner carry a ton of sugar and offer all but ten pounds of it? Did he have a thousand bars each of White King soap and Crystal soap and offer all but five of each? Indeed, to what extent was the amount of each of the products limited as compared with the amount on hand? It will be observed that if under the denouncement of (2) itself petitioner had carried a ton of potatoes in stock and

had offered all but a pound of them for sale he would have been subject to punishment.

The charge under (3), according to the petition, is that petitioner was guilty of "advertising White King soap for sale at 2c per bar and offering for sale Ivory soap at 5c per bar as a substitute for White King soap, the said Ivory soap then and there being of a different quality and brand and bearing a different trade-mark from the White King soap so advertised for sale". This charge is a fair illustration of the defects apparent on the face of (3), as it is couched practically in the language of the enactment. It is not alleged that the prices fixed for the soaps were not fair, nor that the alleged "substitute" was offered to one who had desired the advertised product, nor that the offer was not made to one who came to buy some other and perhaps unadvertised product—coffee, for instance. The pleading is possibly susceptible of the construction that the word "substitute" is used in the sense that petitioner offered an unadvertised article and not one which had been advertised, to whatever person and under whatever circumstances. Here, however, it is to be observed that there is not even an allegation that the Ivory soap had not itself been advertised for sale. The mind becomes weary in unraveling the difficulties manifest in this charge and in the portion of the ordinance upon which it was based.

It is alleged in the petition that petitioner violated the terms of (5) by "offering for sale, and selling, 1 dozen eggs U. S. Extra Large Size, said offering of said eggs for sale, and the sale of said eggs, being then and there contingent upon the concurrent purchase of other articles of merchandise by the purchaser of said 1 dozen eggs". This charge is in the very spirit of (5) itself. Observe that not only did petitioner offer, but he sold. Was the price of each of the articles satisfactory to the buyer or not? Did the acquisition of the articles, or did they not, satisfy a want long felt by him? How was anyone harmed by the transaction under the terms of the charge and under the terms of (5)? Who made the combination contingent? Did the buyer cry for it or did petitioner force it? This matter is left to doubt also by (5) itself. Did the purchaser desire to be a "concurrent" buyer or did he not? If he did, who was

harmed, what fraud was committed, under the charge and under the denouncement fulminated by (5)?

We determine that the ordinance, under the terms of (2), (3) and (5), when invoked to support such charges as the ones inveighed against here, is unconstitutional. The ordinance bears no reasonable or plausible relation to the evils sought to be remedied by it, as they are stated in the briefs.

Petitioner is discharged from custody.

Craig, J., and Stephens, J., concurred.