**WILCOX et al. v. CITY OF PITTSBURGH et al.**

No. 7604.

Circuit Court of Appeals, Third Circuit.

June 30, 1941.

John A. Metz, of Pittsburgh, Pa. (John A. Metz, Jr., W. W. Stoner, and Lester K. Wolf, all of Pittsburgh, Pa., on the brief), for appellants.

Elder W. Marshall, of Pittsburgh, Pa. (Wm. Alvah Stewart, City Sol., Frederic G. Weir, Asst. City Sol., John C. Bane, Jr., and Reed, Smith, Shaw & McClay, all of Pittsburgh, Pa., on the brief), for appellees.

Before BIGGS, CLARK, and GOODRICH, Circuit Judges.

CLARK, Circuit Judge.

The history of our tardy copying of the European system of municipal improvement is well-known.[1] Our ugly, unhealthy and dangerous centers of population have been one of the now admittedly unfortunate results of the wrong kind of "rugged individualism". The city of Pittsburgh joined the procession in 1923 by taking advantage of Pennsylvania's authorization statute of 1919.[2] It enacted a general zoning ordinance which authorized the making a zoning map.[3] That ordinance so far as as it affects the case at bar provided for single dwellings.[4] After sixteen years of quiescence and status quo the City Fathers amended this ordinance in favor of multiple dwellings and hotels.[5]

As the case arose on a motion to dismiss, we take the further facts, as we must, from the complaint.[6] The amendment was enacted at the request of the owner of six acres of property in the block rezoned. The individual wished to utilize the property in question for the erection of a large apartment house. Such use was disapproved by all the neighbors' and by the body, the City Planning Commission, to whom the State of Pennsylvania had entrusted the regulation of the relationship between the location and use of buildings and the municipality's welfare. In the language of the complaint: "* * * The district is an integral part of a larger locality surrounding and adjacent to the same in all directions, comprising approximately sixteen four-sided city blocks, all of which have been continuously since the enactment of said zoning ordinance in 1923 and at the present time constitute a distinctively high-class private residential locality. From the enactment of the zoning ordinance in 1923 until the present time nothing has occurred in the development of said locality to alter or change its character as a high-class residential neighborhood. There are in the portion of said locality comprised by the square of Negley, Wellesley and King Avenues and Hampton Street, with only a very few exceptions, no structures other than such as are permitted in a district zoned as a 'B' residential, Thirty-five (35) foot Height District. The few exceptions which exist are not of a character which interfere with the peace and comfort of the inhabitants of the dwelling houses in the neighborhood or with the value of their properties. Within the district there are no community or public garages, no multiple dwellings as defined in the zoning ordinance except one small three-story apartment building erected prior to the enactment of the Zoning Ordinance and containing sixteen small apartments, no

[1] Bassett, Zoning (1940) 20–33; Metzenbaum, Law of Zoning (1930) 1–40, 105–146; 15 Ency. of Social Sciences 538; 23 Ency. Britannica, 14th Ed., 961; Chamberlain and Pierson, Zoning Laws and Ordinances, 10 American Bar Association Journal 185 and 245; Zoning Progress in the United States, 13 American Bar Association Journal 547; Chamberlain, Zoning Progress, 15 American Bar Association Journal 535; Zoning Laws Grow in Popularity, 15 American Bar Association Journal 328; Landels, Zoning: An Analysis of Its Purposes and Its Legal Sanctions, 17 American Bar Association Journal 163; Van Hecke, Zoning Ordinances and Restrictions in Deeds, 37 Yale Law Journal 407; Baker, Zoning Legislation, 11 Cornell Law Quarterly 164; Constitutionality of Zoning Laws, 24 Columbia Law Review 640 (note).

[2] 53 P.S. § 10726 et seq.

[3] Zoning Ordinance No. 372, approved August 9, 1923.

[4] One family, two family and double dwellings restricted to a thirty-five foot height. See Bassett, Zoning, 192–195.

[5] Ordinance No. 446, approved August 24, 1939, amending Zoning Ordinance No. 372. Exhibit A.

[6] Holtzoff, New Federal Procedure and the Courts, p. 34.

stores, churches, offices, boarding houses, fraternities, clubs, hospitals, or similar structures; approximately 80% of all the buildings (excluding garages) in said district are dwellings occupied by only one family and the remainder, with one or two exceptions, are duplexes or double houses; approximately 70% of all the buildings (excluding garages) in said district are occupied by their owners; and, of the proportion, owned by the plaintiffs, more than 90% are occupied by them." Paragraph 6, Amendment to Complaint, Appendix to Appellants' Brief, pp. 21a–22a.

■ From the pragmatic point of view, it is clear that the difficulty arises from Pittsburgh's failure to heed the advice of the experts. There are two ways of changing a previously adopted zoning plan, by amendment of the adopting ordinance or by application for a variance.[7] In the latter method the non-conforming use is permitted without gradual change and so the evil of spot zoning and gradual return to original chaos is avoided.[8] Although the Pennsylvania statute authorizes the appointment of a municipal zoning board of appeals essential to the working of this more flexible system, the record does not disclose that Pittsburgh has provided for such a body.[9]

■ In the juristic sense we think the council have been fully put upon their proof. The general principle is conceded. Changes in the plan, like the enactment of the original ordinance, are an exercise of police power.[10] A court, therefore, will not ordinarily substitute its judgment for the decision of a municipal council or board of zoning appeals.[11] The appellants' complaint contains three significant assertions. We mention them in the inverse order of their importance. The amended ordinance selects one block out of a larger area; the amendment to the ordinance had an instigator; and finally there has been no change in conditions. It may be that the first two factors are not sufficient. The difference between a city and a wider territory has been pointed out.[12] Furthermore, as we are dealing objectively, if the change is in fact for the benefit of the community, its origin is not significant. The courts, however, have not been unworldly enough to ignore the effect of an anxious client and persistent counsel on the minds of councilmen.[13] If we add to these two considerations the allegation that there has been no change of neighborhood character, the validity of the complaint becomes too plain for argument. As conditions are the basis and justification for zoning, clearly a change in the former is essential to a change in the latter. The cases are collected in a signed note in the Michigan Law Review which discusses and cites all of the cases relied upon by the appellants inter alia.[14] The relevancy of conditions to the purpose of zoning, is so obvious that a change therein has been held to make original zoning restrictions invalid.[15]

[7] Metzenbaum, Law of Zoning 259–261; Bassett, Zoning 120–131; Administrative Law: Zoning: Power to Vary the Application of Zoning Ordinances, 16 Cornell Law Quarterly 579.

[8] See Bassett, Zoning, 122.

[9] 53 P.S. § 9189; See Municipal Corporations—Power of Board of Appeals to Vary Application of Zoning Ordinance, 31 Michigan Law Review 106; Zoning—Police Power—Will Change in Conditions Make Zoning Restrictions Invalid?, 38 Michigan Law Review 434.

[10] Dobbins v. Los Angeles, 195 U.S. 223, 25 S.Ct. 18, 49 L.Ed. 169; Jardine v. City of Pasadena, 199 Cal. 64, 248 P. 225, 48 A.L.R. 509; De Palma v. Town Plan Commission, 123 Conn. 257, 193 A. 868. To the effect that zoning ordinances are not contracts between property owners and the zoning authorities, see Reichelderfer v. Quinn, 287 U.S. 315, 53 S.Ct. 177, 77 L.Ed. 331, 83 A.L.R. 1429.

[11] Miller v. Board of Public Works, 195 Cal. 477, 234 P. 381, 38 A.L.R. 1479.

[12] Byrne, The Constitutionality of A General Zoning Ordinance, 11 Marquette Law Review 189, 210; Bettman, Constitutionality of Zoning, 37 Harvard Law Review 834, 851.

[13] Wippler v. Hohn, 341 Mo. 780, 110 S.W.2d 409, 411; Guaranty Construction Co. v. Town of Bloomfield, 168 A. 34, 11 N.J.Misc. 613; Michigan-Lake Building Corp. v. Hamilton, 340 Ill. 284, 172 N.E. 710; Kennedy v. City of Evanston, 348 Ill. 426, 181 N.E. 312.

[14] Blaske, Zoning—Municipal Corporations—Due Process—Restrictions on Power to Change Zoning Plan Previously Adopted, 38 Michigan Law Review 431.

[15] Skalko v. City of Sunnyvale, 14 Cal. 2d 213, 93 P.2d 93; Austin v. Older, 283 Mich. 667, 287 N.W. 727; Evanston Best & Co. v. Goodman, 369 Ill. 207, 16 N.E. 2d 131; Young Women's Hebrew Ass'n v. Board of Standards and Appeals, 266 N.Y. 270, 194 N.E. 751.

The complaint as amended states a cause of action for injunctive relief based upon an alleged deprivation of property without due process of law. Whether the plaintiffs can support their cause with sufficient evidence to sustain their burden of proof may be another story. But they must be given an opportunity for a hearing upon the merits. The judgment of the District Court is therefore reversed and the cause remanded for further proceedings in accordance with this opinion.

