**Sam R. RUBEN et al.**

v.

**CITY OF PITTSBURGH et al.**

**Civ. A. No. 13714.**

United States District Court
W. D. Pennsylvania.

June 29, 1956.

John A. Metz, Jr. (of Metz, McClure, Hanna & MacAlister), Pittsburgh, Pa., for plaintiffs.

David McNeil Olds (of Reed, Smith, Shaw & McClay), Pittsburgh, Pa., for Public Relations Research Service, Inc.

John M. Marshall, Asst. City Sol. for City of Pittsburgh, Pittsburgh, Pa., for City of Pittsburgh, etc.

GOURLEY, Chief Judge.

This is another phase of the convulsion and reverberation of the Pittsburgh renaissance, commonly described as the "Pittsburgh Story." The circumstances which give rise to this chapter in Pittsburgh's redevelopment might be appropriately called—"Squirrel Hill", "a Mountain or Luxury Apartment."

The matter comes before the court on plaintiffs' twofold request for injunctive relief:

1. To enjoin a rezoning ordinance of the City of Pittsburgh permitting apartment house construction on a tract of 2¼ acres in the vicinity of Whiteman Street and Munhall Road. Ordinance 325, City Council File No. 288, File No. 1740, Series 1955.

2. To specifically enjoin the rezoning of a tract of land within the rezoned area having a frontage of 80 feet and a depth of 233 feet, owned by Public Relations Research Service, Inc., upon which it proposes to erect a luxury type eight story apartment house.

Petitioners' property owners allege a deprivation of property without due process of law. 14th Amendment, United States Constitution.

■ At first impression, I had felt that since the issue posed related to the constitutionality of a municipal ordinance, the matter would require adjudication by a statutory court. Nevertheless, since the suit is not one to restrain the enforcement, operation or execution of a statute of a state within the meaning of the judicial code, it is not within the purview of such court. Ex parte Collins, 277 U.S. 565, 48 S.Ct. 585, 72 L. Ed. 990; 28 U.S.C.A. § 2284.

The general zoning ordinance of 1923, which limited the possible use of defendants' property for 2½ story apartment houses, was in accord with the uses and development of the district at the time of the enactment of said ordinance. Book Vol. 34, page 556, Ordinances, City of Pittsburgh.

The ordinance to which objection is now directed amended the general ordinance of 1923. It is recognized that a previously adopted zoning plan can be changed by either amendment of the adopting ordinance or by application for a variance. No dispute exists that the pronounced change in the provisions of the general ordinance as presently enacted required amendment.

■ Governmental power to interfere by zoning regulations with the general rights of the land owner by restricting the character of his use is not unlimited, and other questions aside, such restriction cannot be imposed if it does not bear a substantial relation to the public health, safety, morals or general welfare. Nectow v. City of Cambridge, 277 U.S. 183, 48 S.Ct. 447, 72 L.Ed. 842.

■ Zoning ordinance which bears no reasonable relation to public safety, health or morals, or the general welfare constitutes taking property without due process of law either under the Fifth or Fourteenth Amendment to the Federal Constitution. American University v. Prentiss, D.C.D.C., 113 F.Supp. 389, affirmed 94 U.S.App.D.C. 204, 214 F.2d 282.

The ordinance now under review must find its justification in some aspect of the police power, asserted for the public welfare.

■ The line which in this field separates the legitimate from the illegitimate assumption of power is not capable of precise delineation. It varies with

circumstances and conditions. Thus the question whether the power exists to forbid the erection of a building of a particular kind or for a particular use is to be determined by considering the building or the thing, not abstractly but in connection with the circumstances and the locality. If the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control. Euclid, Ohio v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303.

Besides a most complete and exhaustive hearing held in connection with this proceeding, the court, of its own volition, personally viewed the area encompassed by the amending ordinance as well as the surrounding environs.

Upon a most thorough evaluation of the evidence, I am compelled to recognize that the comprehensive zoning ordinance as originally passed in 1923 had reference to a neighborhood which was almost entirely residential in nature, with a small number of apartment houses and substantial tract of vacant land.

Deviation from the restrictive provisions of the general ordinance occurred in 1926 when the five story Beacon Apartment was built. A wave of apartment construction took place throughout 1926, culminating in 1929 with construction of the Wendover Apartments.

The influx of population and the close proximity in construction of numerous dwellings and apartment houses have resulted in the virtual extinction of available land, so that no room presently exists for the construction of any apartments within the three floor level unless dwellings are purchased, torn down and replaced with new apartments. Since 1923 a gradual and unrelenting process of replacing private residences with apartments transformed this broad expanse of private residences into an apartment area. In spite of zoning restrictions limiting building to 2½ and 3 stories, the inexorable forces of necessity and reality have resulted in a number of four and five story apartments, climaxed by the construction of the Wendover, a large luxury type apartment. I can only conclude that the overpowering and relentless surge of population growth rendered municipal authorities impotent to cope with the new apartment area even though municipal authorities were armed with the restrictive ordinance of 1923.

In this Squirrel Hill community which is now literally bursting at the seams, a drastic change has taken place in the neighborhood character since the enactment of the 1923 ordinance. The transition from the residential to the luxury apartment type construction is evidenced by the actuality of numerous apartment structures and small commercial establishments which have crept into the neighborhood in violation of existing law. The only possible means to absorb the teaming population who require accommodation in this area is to sanction an eight story luxury apartment.

The complainants in this proceeding place principal reliance on the decision of the United States Court of Appeals for the Third Circuit, Wilcox v. City of Pittsburgh, 121 F.2d 835. In that decision, this Circuit enunciated the rule of law that where a municipality amends a zoning ordinance in which one block or one part of a larger area is changed to permit constructions to be made, which are different than the constructions permitted at the time of the adoption or enactment of the original zoning ordinance, even if the change is, in fact, for the benefit of the individuals who reside or desire to reside in such part of the municipality, the change in the ordinance cannot be sustained unless at the time of the enactment of the amended zoning ordinance there has been a change of neighborhood character as evaluated and compared with the neighborhood character at the time of the adoption of the original zoning ordinance.

I am satisfied that the inevitabilities of Pittsburgh Progress have wrought a change in the character of the neighborhood concerned, which by its very nature conforms to the requirements specified by this Circuit to justify the exercise of

municipal police authority in authorizing luxury type apartment construction.

I am further satisfied that a substantial segment of opposition to the proposed construction arises from the owners of the nearby Wendover Apartment who naturally look askance upon the probabilities of competition in the renting field.

Finally, the peculiar shape of the lot in question and the unusually high cost required to prepare the land for occupancy by any building structure make it unfeasible to develop the land situs with any kind of a residential structure except a six or more story apartment house, having an earning capacity sufficient to carry the land preparation costs.

The stringent limitations for the possible use of this lot are so apparent that were the circumstances of this proceeding reversed, and had City Council barred Public Relations Research Service, Inc., from utilizing the situs for the proposed luxury apartment, I am of the belief that such restriction might most conceivably constitute an unconstitutional deprivation of the property rights of this corporation to make a reasonable use of its land.

The benefits which would redound to the area and the community from construction of a luxury type apartment are manifold. What at present is a useless and unproductive lot would become a source of tax revenue for municipal coffers. The appearance of the area upon which the edifice is built would be materially enhanced. Most significantly, however, Squirrel Hill, which includes the rezoned territory, is predominantly the residence for persons of Hebrew race extraction. Such persons show a strong preference to reside among friends and relatives, and demonstrate an affinity toward the luxury type apartment. This elementary fact is poignantly brought into focus by the undisputed fact that the nearby Wendover Apartment is not only filled to capacity but that a waiting list of tenants is on its rolls. Such an apartment would help fill this vacuum of public need.

To enjoin construction of a luxury type apartment on the proposed lot, recognizing as I must the reality of a changed neighborhood, and the impelling need and demand for such living accommodations, would do violence to the stupendous redevelopment program of the Pittsburgh community, and seriously hinder and retard the onward march of public progress.

I, therefore, find that Ordinance No. 325 is not a taking of petitioners' property without due process nor in any way impinges upon petitioners' constitutional rights, but to the contrary, is a reasonable exercise of police authority in the interest of public safety, health, morals and general welfare.

I further find that the rezoning of the tract of land having a frontage of 80 feet and a depth of 233 feet, owned by Public Relations Research Service, Inc., to permit the erection of a luxury type apartment is a valid and constitutional exercise of municipal police authority in the interest of the public safety, health, morals and general welfare.

The Court enters the following Findings of Fact and Conclusions of Law:

### Findings of Fact

1. The rezoned area is a tract of 2.9 acres, having frontage on the west on Wightman Street and on the east on Munhall Road. It is located in the 14th Ward of the City of Pittsburgh, between Beacon Street and Hobard Street.

2. Part of the rezoned area is a tract of land of irregular shape, having a frontage of 80 feet on the eastern side of Wightman Street, a 60 foot public street of the City of Pittsburgh, and exending back from that street a depth of about 233 feet. This part of the rezoned area is in the approximate shape of the letter "T" with the foot of the "T" fronting on the street. It has a maximum width at the rear of about 250 feet. It is owned by Public Relations Research Service, Inc., one of the defendants. For the sake of convenience, this part of the rezoned area will be referred to as the "Apartment Site".

The balance, and larger part, of the rezoned area is a tract of land of irregular shape being approximately square, fronting on Munhall Road at the westerly terminus of that street. It lies between the easterly property line of the Apartment Site and Munhall Road. It is owned by H. N. Goldstein, who is not a party to this suit. For the sake of convenience, it will be referred to as the "Beacon Apartments Property". The total area of the rezoned area is about 95,000 square feet.

3. The Apartment Site has located on it the shell of a residence, which was abandoned years ago. The abandoned building has no economic value and is, according to the neighbors, a health and safety hazard. It is located toward the rear property line at a distance of more than 150 feet from Wightman Street. Aside from the abandoned building, the Apartment Site is unimproved. It is a steep hillside. The property rises 35 feet from its Wightman Street frontage to the rear property line. By reason of excavation of adjoining properties on all sides except the east, the property is substantially above the level of such adjoining properties.

4. The cost of preparation of the Apartment Site for construction of an apartment building at the level of Wightman Street will well exceed $100,000.

5. The peculiar shape of the Apartment Site and the high cost of land preparation for construction make it unfeasible to develop the Apartment Site with any kind of a residential structure except a six or more story apartment house, having an earning capacity sufficient to carry the land preparation costs.

6. The highest and best use of the Apartment Site is for a six or more story apartment house with elevators, having sufficient rental units to produce an income sufficient to amortize the cost of land preparation and building development.

7. The fact that the property has not been utilized for any residential use (or for that matter, any other use) for many years, is an indication that the previous zoning classification did not permit economic utilization.

8. Defendant Public Relations Research Service, Inc., proposes to erect a luxury type eight story apartment house on the Apartment Site. The plans for the proposed structure indicate that it will be of a tasteful architectural design, which will enhance the immediate neighborhood. The proposed construction will contribute greatly to the improvement of health and safety in the immediate neighborhood by converting the present unimproved and unsanitary condition of the property into a first class residential structure site.

9. The proposed improvement will substantially increase tax revenues to the City of Pittsburgh by permitting a maximum economic utilization of the property.

10. While some of the owners of property in the neighborhood oppose improvement on the Apartment Site, several neighbors living or owning in the immediate vicinity of the property believe that a first class apartment house will benefit their properties and the entire neighborhood by converting the blight of the property as it presently exists into a first class residential area.

11. The plans for the building indicate that it will have no commercial shops and that its garage facilities will be completely enclosed in the basement of the building. The plans also show that the Wightman Street frontage will be improved with a garden plaza approach to the apartment house structure, producing a most desirable appearance to the neighbors across Wightman Street, which include several of the plaintiffs.

12. The rezoned area is in the Fourteenth Ward of the City of Pittsburgh, which is numerically and geographically the largest Ward of the City of Pittsburgh. It is in general a residential district, although it has zoning classifications from Light Industrial to Single Family Residential.

13. The general neighborhood of which the rezoned area is a part is bounded on the north by Beacon Street, on the east by Murray Avenue, on the south by Pocusset Street and on the west by Schenley Park. It is in general a multiple-family dwelling unit neighborhood, but the area along Murray Avenue is Commercial.

14. Beacon Street, in part 80 feet wide (from Wightman Street to Murray Avenue) and in part 100 feet wide (from Wightman Street to Schenley Park), divides the neighborhood of the rezoned area from a different type of neighborhood to the north in which there are many more single-family homes.

15. The immediate neighborhood of the rezoned area is bounded by Hempstead Road and Covode Street on the south, Wendover Street on the west, Beacon Street on the north and Munhall Road on the east.

16. In the immediate neighborhood there are 55 multiple-family dwellings not counting row houses and double duplexes, and 63, including those two classifications, which occupy the majority of the land in the neighborhood. Most of the rest of the property in the neighborhood is developed with two family houses (or duplexes).

17. The nearest single family house section to the rezoned area is north of Beacon Street. None of the plaintiffs live in that section. It is apparent that the width of Beacon Street serves as an effective physical and psychological barrier between that section and the immediate neighborhood of the rezoned area.

18. The apartment houses in the immediate neighborhood are, with the exception of two small apartments, three stories or more in height. The difference in height zones in the immediate neighborhood does not seem to have affected height of structures. For example, the Parkway Apartments, located on the property immediately abutting to the south, owned by Morris Kwall, one

of the plaintiffs in this action, is four stories in height, although in an H–1 (2½ story—35 feet) zone.

19. The largest apartment house in the neighborhood is the Wendover, fronting on Hobart Street, about 100 feet west from the corner of Wightman Street and about 250 feet from the nearest part of the rezoned area. The Wendover is a seven story apartment house, with 125 families in it.

20. In the immediate neighborhood there are eight different classification areas, one of which is identical with the rezoned area, and two of which differ in only one particular (H–2 instead of H–3 height classification). Only one of the classification areas is more restrictive in every particular than the rezoned area, and none of the plaintiffs live in that classification area, which is the area north of the rezoned area, fronting on Beacon Street.

21. By comparison with the classification of the rezoned area, the classifications in the immediate neighborhood are as follows:

Use Classification

| Rezoned area | Immediate Neighborhood |
|---|---|
| U-4 (Multiple-family) | 6 U-4, 1 U-3 (Commercial) 1 U-5 (2 family) |

Area Classification

| Rezoned area | Immediate Neighborhood |
|---|---|
| A-4 | 3 A-4, 1 A-3, 3 A-2, 1 A-1 |

Height Classification

| Rezoned area | Immediate Neighborhood |
|---|---|
| H-3 | 1 H-3, 4 H-2, 3 H-1 |

22. Treating husband and wife property owners as a single party, five of the eleven plaintiffs are the owners of apartment houses in the immediate neighborhood: William J. Kappel et ux. has three apartment houses (two on Hempstead Road and one on Munhall Road); Morris Kwall et ux. has one apartment on Munhall Road; N–R Corporation has two apartments on Hobart Street, and

Herman Kamin has one apartment on Hempstead Road. None of the plaintiffs is the owner of a single-family home, as defined in the zoning ordinance.

23. A survey made by the City Planning Commission in May, 1955, at the time of the request for rezoning of the rezoned area disclosed that of 921 families residing in the immediate neighborhood, 834 lived in multiple-family dwelling units, 70 in two family structures and only 17 lived in single-family dwelling units. Of these 17 families one lived in a school and another had four roomers also in residence.

24. Of the 834 families living in multiple-family dwelling units almost half lived in structures accommodating more than twelve families, and 711 of the 834 families lived in units accommodating 12 or more families.

25. Expressed in percentages, 90% of the families in the neighborhood were found to be living in multiple-family dwelling units as defined in the zoning code, and 77% of the families in the neighborhood were found to be living in structures accommodating 12 or more families, which could reasonably be termed substantial apartment houses.

26. In the immediate neighborhood there are two grocery-delicatessen stores, two beauty shops, a drug store and two schools, the H. B. Davis Elementary School and Yeshiva High School.

27. The use of the properties abutting the rezoned area is as follows:

To the north    (properties fronting on Beacon St.)

| A. B. Prise | (50' x 110') | Duplex (2 families) |
|---|---|---|
| H. Myers | (35' x 110') | " " |
| L. E. Wall | (35' x 110') | " " |
| R. Zweig | (35' x 110') | " " |
| D. Murovitz | (35' x 110') | " " |
| F. Cohen | (35' x 110') | " " |
| M. Hirsch | (35' x 110') | " " |
| B. Lewis | (40' x 110') | " " |
| P. J. Harris | (39' x 100') | " " |

Property fronting on Wightman Street
B. J. Ravich   (28.5' x 135') 1/2 Two family house

To the south    (property fronting on Wightman St.)

Morris Kwall   (162.5' x 88')      24 family apartment house, 2 stores, garage (Commercial Zone)

Properties fronting on Hobart Street
S. Rotter   (87' x 95' x 70')   1 story store and two family dwelling.
S. Cohen   (100' x 120')   12 family apartment house, 10 garages
A. Reiner   (100' x 120')   12 family apartment house, 2 garages
N–R Corp.   (200' x 120')   two 12 family apartment houses

To the east    (properties fronting on Munhall Road)
S. H. Zuckerman   (100' x 100')   12 family apartment house
Munhall-Forbes Realty, Inc.   (84' x 170' irreg.) 6 family triple duplex

To the west    (properties fronting on Wightman St.)
B. Kuntz   (21.3' x 136' x 49.5')   1/2 of two family house
M. Goldman   (26.4' x 135' x 15')   1/2 of two family house
D. Krasne   (19.5' x 13.5' x 17.5')   1/2 of two family house
B. J. Ravich   (as above)
Morris Kwall   (as above)

28. The basic zoning ordinance of the City of Pittsburgh was adopted in August, 1923 and classifies districts on three bases: Use, Height and Area. The pertinent Use District Classifications are:

U–3   Commercial
U–4   Multiple-family dwellings
U–5   Two family dwellings
U–6   Single family dwellings

The pertinent Height District Classifications are:

H–1   35 ft. (2–1/2 stories)
H–2   45 ft.   (3 stories)
H–3   100 ft.   (8 stories)

The pertinent Area District Classifications are:

|  | (1–3 stories) | (4–8 stories) |
|---|---|---|
| A–1 | 2,000 sq. feet | 2,000 sq. feet |
| A–2 | 1,250 " " | 1,000 " " |
| A–3 | 1,000 " " | 800 " " |
| A–4 | 700 " " | 550 " " |

(all square feet per family)

29. The original zoning of the block of which the rezoned area is a part (i. e., the block bounded by Beacon Street, Murray Avenue, Hobart Street and Wightman Street) was U–4, A–2, H–1 for the larger part, but the eastern end of the block, fronting on Murray Avenue, was U–3, H–3, A–3.

30. Since the basic zoning ordinance was passed in August, 1923, there have been zoning changes made in the neighborhood of the rezoned area, as follows:

(a) August 7, 1925 (Ordinance No. 362 of 1925)

Changing both sides of Beacon Street from the easterly line of Wightman Street east to a line at the rear of lots fronting on the west side of Murray Avenue from a U–4 (multiple-family residential) to a U–5 (two family residential) Use District, and from an A–2 to an A–1 Area District (Zoning Change 26).

(b) March 14, 1928 (Ordinance No. 133 of 1928)

Changing an area 390 feet long on the northerly side of Covode St. from U–5 (two family) to U–4 (multiple-family) and that, and the adjacent area to the north fronting on the southerly side of Hobart Street from an H–1 (35 feet) to H–3 (100 feet) Height District, and from an A–1 and A–2 to an A–4 Area District (Zoning Change 83). This zoning change was made to permit the construction of the Wendover Apartment.

(c) November 17, 1928 (Ordinance No. 730 of 1928)

Changing an area at the northeast corner of Wightman and Hobart Streets (including part of the rezoned area) from U–4 (multiple family residential) to U–3 (Commercial) (Zoning Change 108).

(d) May 13, 1929 (Ordinance No. 315 of 1929)

Changing an area approximately 220 feet in length on both sides of Phillips Avenue 100 feet west of Wightman Street from U–5 to U–4, and from A–1 to A–2 (Zoning Change 131).

(e) August 10, 1929 (Ordinance No. 588 of 1929)

Changing an area bounded by the southerly line of Hobart on the north, the easterly line of Wightman on the west, the northerly line of Phillips Avenue on the south and a line parallel with Wightman and approximately 500 feet east of it on the east from an H–1 (35 feet) to H–2 (45 feet) Height District, and from an A–1 to an A–4 Area District (Zoning Change 137).

(f) September 27, 1935 (Ordinance No. 269 of 1935)

Changing an area on the north side of Covode Street west of Wightman Street (adjacent to area involved in (b) above) and on the south side of the same street from U–5 (two family) to U–4 (multiple family) Use District (Zoning Change 243).

(g) August 27, 1936 (Ordinance No. 282 of 1936)

Changing both sides of Wightman Street from the northerly line of Beacon Street to the southerly line of Darlington Road from U–5 (two family) to U–6 (one family) (Zoning Change 247).

(h) April 20, 1937 (Ordinance No. 136 of 1937)

Changing an area bounded by Wightman, Covode, Murdock and Beacon Streets from an H–1 (35 ft.) to an H–2 (45 ft.) height district (except for those parts of that area already zoned H–2 (45 ft.) under the original zoning ordinance, being the area long both sides of Wendover St., and H–3 (100 Ft.), being the area previously rezoned by zoning change No. 83 for construction of The Wendover). Also, changing an area within the above mentioned area at Cavode and Murdock Streets from U–5 (Two family) to U–4 (Multiple-Family), and from A–1 to A–3 area district.

(i) February 16, 1939 (Ordinance No. 71 of 1939)

Changing an area at the southwest corner of Covode and Murdock Streets from U–5, H–1, A–1 to U–4, H–2, A–3, (Zoning Change 283).

(j) November 3, 1955 (Ordinance No. 435 of 1955)

Changing an area at Wightman and Pocusset Streets from U–5 (two family) to U–4 (multiple-family) and A–1 to A–2.

31. All of the zoning changes which have occurred (except the 1925 and 1936 changes, which are oriented toward and concerned with the area north of Beacon Street, an area substantially different in character than the neighborhood of the rezoned area) reduced zoning restrictions and were calculated to permit multiple-family dwelling unit construction.

32. The map of the larger area bounded by Forbes Street, Murray Avenue, Pocusset Street and Schenley Park shows that the substantial majority of the land in that area is zoned U–4 (multiple-family dwellings). It also shows that the area along Murray Avenue, zoned Commercial, is a substantial part of the total area. There is only one small area, two blocks long and one lot deep on Wightman Street on the other side of Beacon Street from the rezoned area which is restricted to single family houses. This map shows that the rezoned area is in the section of the largest concentration of apartment houses in the larger area.

33. The map shows that the Commercial zone adjacent to the rezoned area is the only Commercial Zone in the larger area beside the Murray Avenue frontage. It also indicates that the rezoned area is between an H–3 district on Hobart Street west of Wightman, and the H–3 district on Hobart Street east of Wightman.

34. In 1923 there was a great deal of vacant land in the neighborhood of the rezoned area.

35. Since 1923 more than 48 of the 55 apartment houses in the neighborhood have been built.

36. No single family home has been built in the immediate neighborhood since the passage of the Ordinance of 1923.

37. No single or a two family residential structure has been built on any of the plaintiffs' property since 1926.

38. None of the plaintiffs has built a structure other than an apartment house on their property in the last thirty years.

39. The immediate neighborhood is an apartment house neighborhood in character.

40. The land occupied by apartment houses is the substantial majority of the land in the neighborhood.

41. The character of the neighborhood is consistent with the zoning classification of the rezoned area.

42. The Master Plan of the City of Pittsburgh designates the rezoned area and the immediate neighborhood as a "Residential Improvement District", and

the zoning classification of the rezoned area is fully consistent with the Master Plan of the City of Pittsburgh.

43. The change in the zoning of that portion of the rezoned area previously classed as Commercial (U-3) to Residential (U-4) brings that portion of the rezoned area into conformity with the Master Plan of the City of Pittsburgh.

44. The use of the apartment site for an eight story apartment house is the highest and best use of the property from a real estate and engineering standpoint. It is also the most economic use of the property.

45. Use of the property for construction of single or double residences, or a three story apartment house, would be uneconomical and therefore highly unlikely.

46. The current demand for rental housing in a multiple story, elevator type, garden apartment in the Squirrel Hill neighborhood indicates a need for this type of improvement.

47. Such improvement within the City limits is necessary for the economic health of the City because of the construction of apartments in suburban areas which are attracting many of the better class of apartment dwellers from the City.

48. Ordinary financing sources would not be available for the improvement of this property with anything less than a six or eight story apartment, because of the economics of the situation.

49. The character of the neighborhood and existing adjacent improvements would discourage the construction of an elaborate single family home on the property, and its peculiar shape and lack of access to a public street would prohibit construction of two family houses.

50. The zoning change was made in full accordance with statutory requirements.

51. A public hearing was held by the City Council of the City of Pittsburgh, as required by law, on July 26, 1955. At that time, of twenty-six people present, twelve were in favor of the zoning change and fourteen against it. Of eighteen abutting property owners, only four were present. Three of these abutting owners were in favor of the proposed zoning change and one opposed.

52. The real estate taxes on the part of the rezoned area owned by Defendant Public Relations Research Service, Inc., identified in these requests as the "Apartment Site", were not paid to the City of Pittsburgh and School District of the City of Pittsburgh from 1926, the year when the house on the property was built, until 1951, when it was purchased as vacant land by Public Relations from the taxing bodies. Taxes were not paid to the County of Allegheny from 1930 until 1951. The property was tax delinquent for twenty-three years before it was sold for taxes in 1949, and at that sale the delinquent taxes amounted to more than $26,000.

53. The taxes on the apartment building which Defendant Public Relations proposes to construct would be approximately $75,000 a year.

54. The fact that the taxes on the property were so long delinquent when the property was used for a single family dwelling indicates that such utilization of the property is uneconomical and unlikely.

55. Saul J. Gershuny, one of the original plaintiffs, is no longer a plaintiff and has withdrawn from the case.

56. Exhibits Z and AA show that there were only a few structures in the immediate neighborhood of the rezoned area prior to 1922, which was the year before the Zoning Ordinance of 1923, and most of the land in the neighborhood was vacant.

57. Exhibits Z and AA show that what development there was in the neighborhood was largely single and two family homes, and that there were only a few small apartment houses on Wendover Street, a block west of the rezoned area.

58. The owners and occupants of two residences abutting the rezoned area

believe that the construction of an eight-story apartment in the rezoned area would improve the neighborhood and benefit their property.

59. The construction of an eight-story apartment house as planned by Defendant Public Relations would not cause any diminution in the value of abutting properties.

60. Plaintiffs' Exhibit Z establishes that the neighborhood has changed in character since 1923 when the original zoning ordinance was passed from a partially developed private residential district to an apartment house district.

61. Numerous witnesses familiar with the neighborhood (Hasley, Kelsky, Levinson, Goldman, Kodinsky) testified that the neighborhood had been developed as an apartment house neighborhood.

62. Defendants' photographic exhibits show that there is one seven-story apartment (The Wendover); one five-story apartment (The Beacon) and many four-story apartments nearby.

63. The Wendover Apartments is a large apartment house structure, located on the south side of Hobart Street about 120 feet west of Wightman Street, and about 250 airline feet from the rezoned area. The main portion of the building is in part seven stories in height and in part six stories. There are two stores, a gasoline station and a parking garage in the main building. An addition has been built on the rear, extending to Covode Street, which is in part two stories, in part three stories, and in part four stories high. The apartment has 125 dwelling units, which are filled to capacity. The main building was built in 1929, six years after the original zoning ordinance.

64. The area of the Wendover Apartments is zoned identically with the rezoned area.

65. The Morrowfield Apartments is a seven story structure located on Murray Avenue south of Pocusset Street, about four blocks from the rezoned area. It is located in part in the 100 ft. height district which extends along both sides of Murray Avenue south from Forbes Street, and in part in a more restricted height district.

66. The number of zoning changes made in the zoning of the vicinity of the rezoned area since 1923 is above average for areas of similar geographic extent in the City.

Conclusions of Law

1. The challenged ordinance was enacted in full compliance with applicable law, and with procedural due process.

2. The ordinance does not deprive any of the plaintiffs of any property right, within the meaning of the Fourteenth Amendment of the United States Constitution.

3. The plaintiffs have failed to prove that the ordinance was not enacted by the legislative body in the best interests of the citizens of the City as a whole, and to serve the public health, welfare and safety.

4. The plaintiffs were not discriminated against, or denied equal protection of the laws by the ordinance.

5. The action of the City Council and of the Mayor of the City of Pittsburgh in enacting and approving Ordinance No. 325 of 1955, rezoning the property therein described, violated no provision of the Fourteenth Amendment.

6. Ordinance No. 325 of 1955 is a valid enactment, not in conflict with the Constitution of the United States, and plaintiffs are not entitled to injunctive relief.

An appropriate order is entered.